## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA,

   **and**

THE STATE OF INDIANA,

                           ***Plaintiffs***,

        **v.**

METALWORKING LUBLICANTS
COMPANY,

                    ***Defendant.***

Civ. No. _____

## COMPLAINT

Plaintiffs, the United States of America ("United States"), by the authority of the

Attorney General and through the undersigned attorneys, and at the request of the Administrator

of the United States Environmental Protection Agency ("EPA"), and the State of Indiana

("Indiana" or the "State") on behalf of the Indiana Department of Environmental Management

("IDEM") (collectively, "Plaintiffs") file this Complaint and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought pursuant to Section 113(b) of the Clean Air Act

("Act"), 42 U.S.C. § 7413(b), and pursuant to the laws of Indiana, for assessment of civil

penalties and injunctive relief against Metalworking Lubricants Company ("Defendant" or

"MLC") for violations of its Federally Enforceable State Operating Permits ("FESOPs"); the

National Emissions Standards for Hazardous Air Pollutants for Off-Site Waste and Recovery

Operations ("Off-Site Waste NESHAP"), 40 C.F.R. Part 63, Subpart DD; and Title V of the Act,

42 U.S.C. § 7661a, in connection with Defendant's oil recycling and refining facility in Indianapolis, Indiana.

2.      As explained further below, the Metalworking Lubricants facility in Indianapolis failed to meet pollution control requirements and emitted hazardous air pollutants at levels above what is allowed by law.  The hazardous air pollutants emitted from the facility can impact human health, with potential effects including irritation of the skin, eyes, nose, and throat; constriction of the chest; gastrointestinal and neurological effects; central nervous system effects, such as headache, dizziness, fatigue, tremors; and cancer.

## JURISDICTION, VENUE, AUTHORITY AND NOTICE

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

4.      Under 28 U.S.C. § 1367 this Court has supplemental jurisdiction over state law claims asserted by Indiana pursuant to Rule 326 of the Indiana Administrative Code and the rules adopted thereunder.

5.      Venue is proper in this judicial district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395.  Defendant does business in, and these claims arose within, this judicial district.

6.      Authority to bring this action is vested in the United States Department of Justice pursuant to Section 305 of the Act, 42 U.S.C. § 7605.

7.      Notice of commencement of this action has been given to Indiana pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b).

8.      Authority to bring this action for the People of the State of Indiana is vested in the Indiana Attorney General. The Indiana Attorney General is the chief legal officer of the State of Indiana, having the powers and duties prescribed by the law, Ind. Code § 4-6-1-6. Under Ind.

Code § 4-6-3-2 the Indiana Attorney General has charge of and directs the prosecution of all civil actions brought in the name of the State of Indiana or any state Agency. Pursuant to Ind. Code § 13-13-5-1, IDEM is charged with the administration and enforcement of the requirements for air pollution control for Indiana for all purposes of the federal Clean Air Act. Pursuant to Ind. Code § 13-13-5-2, IDEM may take any action necessary to secure for Indiana the benefits of the federal statutes described in Ind. Code § 13-13-5-1, which includes the federal Clean Air Act, as amended by the Clean Air Act Amendments of 1990.

## PARTIES

9.      Plaintiffs are the United States of America, acting at the request of the EPA, an agency of the United States, and Indiana, on behalf of IDEM.

10.     Defendant Metalworking Lubricants Company is a privately held corporation incorporated under the laws of the State of Michigan and doing business in this judicial district.

11.     Defendant is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), and within the meaning of Section 113(b) of the Act, 42 U.S.C. § 7413(b).

12.     At all times relevant to this Complaint, the Defendant was the owner and operator of the Metalworking Lubricants Company oil recycling and refining facility (the "MLC Facility") in Indianapolis, Indiana.

## STATUTORY AND REGULATORY FRAMEWORK

13.     The Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air resources to promote the public health and welfare and the productive capacity of its population. *See* 42 U.S.C. § 7401(b)(1). Section 109 of the Act requires the development of Primary and Secondary National Ambient Air Quality Standards ("NAAQS") to protect public health and welfare. *See* 42 U.S.C. § 7409. To attain and maintain these standards, each State is required to develop a state implementation plan. *See* 42 U.S.C. § 7410.

## The State of Indiana's FESOP program

14.     The Indiana SIP at 326 IAC 2-8-4(5)(A) requires the permittee to comply with all conditions of the FESOP.  Non-compliance with any provision of a FESOP is grounds for enforcement.

15.     Pursuant to the Indiana SIP at 326 IAC 2-8-6(b), all terms and conditions in a FESOP, including any provisions designed to limit a source's potential to emit, are enforceable under the Act by EPA.

16.     Pursuant to 40 C.F.R. § 52.23, a person failing to comply with any permit limitation or condition contained within a permit to operate issued under an EPA-approved regulatory program that is incorporated into a SIP, shall render that person in violation of the SIP, thus making that person subject to an enforcement action under Section 113 of the Act, 42 U.S.C. § 7413.

17.     On October 27, 2003, IDEM issued to MLC FESOP Renewal No. F097-15365-00139.

18.     On February 7, 2008, IDEM issued to MLC an Administrative Amendment to FESOP Renewal No. F097-15365-00139 (the "2008 FESOP").

19.     On June 25, 2015, IDEM issued to MLC FESOP Renewal No. F097-32513-00139.

20.     On July 13, 2015, MLC petitioned, pursuant to the authority of IAC 4-21.5-3-7, for administrative review and a stay of the effectiveness of certain conditions of FESOP Renewal No. 097-32513-00139.

21.     On October 29, 2015, IDEM issued an Administrative Amendment to FESOP Renewal No. 097-32513-00139 (the "2015 FESOP").

22.     On November 13, 2015, MLC petitioned for administrative review and a stay of effectiveness of certain conditions of the administrative amendment to FESOP 097-32513-00139.

23.     On September 26, 2016, IDEM and MLC entered into a stay agreement of effectiveness of certain conditions of the administrative amendment to FESOP 097-32513-00139 (the "Limited Stay").

### MLC's 2008 FESOP Requirements

24.     Condition D.2.3 of the 2008 FESOP required MLC to record the total static pressure drop across the scrubber used in conjunction with the controlled tanks, at least once per day. When any one pressure drop reading across the scrubber is outside the normal range of 1-4 inches of water or a suitable range established during the latest stack test, MLC must take reasonable response steps in accordance with Section C of the 2008 FESOP.  A pressure drop reading that is outside the above mentioned range is not a deviation from the permit. Failure to take response steps in accordance with Section C is considered a deviation from the permit.

25.     Condition C.17 of Section C-Response to Excursions or Exceedances of the 2008 FESOP provides that:

> (a) Upon detecting an excursion or exceedance, MLC must restore operation of the emissions unit (including any control device and associated capture system) to its normal or usual manner of operation as expeditiously as practicable in accordance with good air pollution control practices for minimizing emissions.

> (b) The response must include minimizing the period of any startup, shutdown or malfunction and taking any necessary corrective actions to restore normal operation and prevent the likely recurrence of the cause of an excursion or exceedance (other than those caused by excused startup or shutdown conditions).

> (c) Failure to take reasonable response steps is considered a deviation from the permit.

### MLC's 2015 Permit and Stay Requirements

26.     Condition D.1.1(e) of the 2015 FESOP and Limited Stay provides that total hazardous air pollutant ("HAP") emissions from receiving, handling, processing, storage and treatment (including wastewater and process treatment) shall not exceed 24 tons per twelve 12 consecutive month period, with compliance determined at the end of each month.

27.     Condition D.1.3 of the 2015 FESOP and Limited Stay provides that the hypochlorite injection scrubber shall be in operation when the identified heated tanks are in operation.

28.     Condition D.1.4 of the 2015 FESOP and Limited Stay provides that the scrubber system serving the tanks for sulfur dioxide ("$SO_2$"), volatile organic compounds ("VOC"), and HAP control shall be in operation and control emissions from the tanks at all times the tanks are operating or holding liquid.

29.     Condition D.1.6 of the 2015 FESOP, as modified by the Limited Stay, requires that MLC calculate the sulfur, VOC and HAP content of each shipment of waste product received and each additive used in the processing of waste. These calculations are intended to determine the fugitive and stack emissions from receiving, handling, processing, storage, and treatment (including wastewater and process treatment) pursuant to the FESOPs.

### NESHAP for Hazardous Air Pollutants from Off-Site Waste and Recovery Operations

30.     In furtherance of the goal to protect and enhance the quality of the nation's air resources, Congress established an initial list of HAPs including *inter alia* xylenes, toluene, phenol, and polycyclic aromatic hydrocarbons. *See* Section 112(b) of the Act, 42 U.S.C. § 7412(b).

31.     Section 112(c) of the Act, 42 U.S.C. § 7412(c), requires EPA to publish and periodically revise a list of all categories and subcategories of new and existing major and area sources of the HAPs listed pursuant to Section 112(b) of the Act, 42 U.S.C. § 7412(b).

32.     Section 112(d) of the Act, 42 U.S.C. § 7412(d), requires EPA to promulgate technology-based emissions standards to regulate the emission of HAPs for each category and subcategory listed pursuant to Section 112(c) of the Act.

33.     Pursuant to Section 112 of the Act, on July 1, 1996, EPA promulgated the Off-Site Waste NESHAP. 61 Fed. Reg. 34158, July 1, 1996.

34.     The Off-Site Waste NESHAP at 40 C.F.R. § 63.680(a) provides that the provisions of the Off-Site Waste NESHAP apply to the owner and operator of a facility for which both of the conditions specified in 40 C.F.R. § 63.680(a)(1) and (a)(2) are applicable.

35.     Pursuant to 40 C.F.R. § 63.680(a)(1), for the Off-Site Waste NESHAP to apply, the facility must be a major source of HAP emissions as defined in 40 C.F.R. § 63.2. Under 40 C.F.R. § 63.2, a "major source" of HAP emissions means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.

36.     Pursuant to 40 C.F.R. § 63.680(a)(2), for the Off-Site Waste NESHAP to apply, the facility must include one or more operations that receive off-site materials as specified in 40 C.F.R. § 63.680(b) and one or more waste management or recovery operations specified in 40 C.F.R. § 63.680(a)(2)(i) through (a)(2)(vi).

37.     Pursuant to 40 C.F.R. 40 C.F.R. § 63.6(c)(5), the owner or operator of an area source that increases its emissions of (or its potential to emit) HAPs such that the source

becomes a major source is subject to relevant standards for existing sources. Such sources must comply by the date specified in the standards for existing area sources that become major sources. If no such compliance date is specified in the standards, the source shall have a period of time to comply with the relevant emission standard that is equivalent to the compliance period specified in the relevant standard for existing sources in existence at the time the standard becomes effective.

38.     Pursuant to 40 C.F.R. § 63.680(e), the owner or operator of an affected source that commenced construction or reconstruction before October 13, 1994, and receives off-site material for the first time before February 1, 2000, must achieve compliance with the provisions of the Off-Site Waste NESHAP on or before February 1, 2000. These existing affected sources must be in compliance with the tank requirements of 40 C.F.R. § 63.685(b)(1)(ii) two years after the publication date of the final amendments on March 18, 2015; the equipment leak requirements of 40 C.F.R. § 63.691(b)(2) one year after the publication date of the final amendments on March 18, 2015; and the pressure relief device monitoring requirements of 40 C.F.R. § 63.691(c)(3)(i) and (ii) three years after the publication date of the final amendments on March 18, 2015.

39.     Pursuant to 40 CFR § 63.6(c)(1), after the effective date of a relevant standard established under Part 63 pursuant to section 112(d) or 112(h) of the Act, the owner or operator of an existing source must comply with such standard by the compliance date established by the Administrator. Except as otherwise provided in section 112 of the Act, in no case can the compliance date established for an existing source in an applicable subpart of exceed three years after the effective date of such standard.

40.    Pursuant to 40 C.F.R. § 63.697(a)(1), the owner or operator of an affected source must submit notices to the Administrator in accordance with the applicable notification requirements in 40 C.F.R. § 63.9 as specified in Table 2 of the Off-Site Waste NESHAP.

41.    Pursuant to 40 C.F.R. § 63.9(b)(1), if an area source that otherwise would be subject to an emission standard or other requirement if it were a major source subsequently increases its emissions of hazardous air pollutants (or its potential to emit hazardous air pollutants) such that the source is a major source that is subject to the emission standard or other requirement, such source is subject to the notification requirements.

42.    Pursuant to 40 C.F.R. § 63.9(b)(2), the owner or operator of an affected source that has an initial startup before the effective date of a relevant standard under 40 C.F.R. Part 63 must notify the Administrator in writing that the source is subject to the relevant standard.

**Title V Requirements**

43.    Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b) provide that, after the effective date of any permit program approved or promulgated under Title V of the Act, no source subject to Title V may operate except in compliance with a Title V Permit.

44.    EPA approved of Indiana's Title V program with an effective date of July 15, 2002.  *See* 67 Fed. Reg. 34,844.

45.    State operation permit program conditions, at 40 C.F.R. § 70.3(a), require, in relevant part, that the state program provide for permitting of major sources.

46.    State operating permit program conditions at 40 C.F.R. § 70.5(a)(1) require that an application for a source applying for a part 70 permit for the first time be submitted within 12 months after the source becomes subject to the permit program or on or before such earlier date as the permitting authority may establish.

**Civil Enforcement**

47.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), provides EPA authority to commence a civil action for injunction and civil penalty where a person violates any requirement or prohibition of an applicable implementation plan or permit.

48.     Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 ("DCIA"), and the Federal Civil Penalties Inflation Act Improvement Act of 2015 (Section 701 of Public Law 114-74), which further amended the DCIA, and pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, which was promulgated pursuant to the DCIA, the maximum amount of the civil penalties provided under Section 113(b) of the Clean Air Act was increased to $37,500 per day for each violation occurring from January 12, 2009 until November 2, 2015, and $109,024 per day for each violation occurring after November 2, 2015 and assessed on or after January 12, 2022.

49.     Pursuant to Ind. Code §§ 13-13-5-1, 13-13-5-2, and 13-30-4-1, Indiana may seek injunctive relief and civil penalties not to exceed $25,000 per day of any violation of air pollution control laws in a civil action commenced in any court with jurisdiction.

**GENERAL ALLEGATIONS**

50.     At all times relevant to this Complaint, Defendant owned and operated the MLC Facility that is the subject of this action.

**The MLC Facility**

51.     The MLC Facility is located at 1501 South Senate Avenue, Indianapolis, Indiana, an urban area close to other industrial facilities and residents.

52.     The MCL Facility is a "stationary source" within the meaning of Section 112(r)(2)(C) of the Act, 42 U.S.C. § 7412(r)(2)(C) and 40 C.F.R. § 68.3.

53.     The MLC Facility takes in waste oil and wastewater (e.g., industrial sludge and coolant waters) from facilities such as steel mills and automotive industries.

54.      The MLC Facility recycles the waste oil and wastewater to generate off-spec fuel for various industries such as cement kilns, the automotive industry, steel industry, and asphalt plants.

55.     The MLC Facility treats the wastewater to state and federal guidelines and releases it to the publicly owned treatment works ("POTW").

56.      The MLC production process emits HAPs, $SO_2$, and VOCs to the air.

57.     MLC operates a number of heated production tanks, at least one heated water tank, and a number of heated product tanks.

58.     MLC nominally controls all of the above referenced tanks by a hypochlorite injection scrubber followed by a carbon box ("Heated Tank Scrubber/Carbon Box Operation") at the MLC Facility.

### EPA's Investigations

59.     On July 8, 2011, the EPA issued a Section 114 Request for Information to MLC, pursuant to the Act, 42 U.S.C. § 7414(a)(1), based on odor complaints from the community surrounding the MLC Facility.

60.     In response to that Request, MLC submitted scrubber logs that showed MLC had failed to take reasonable steps when the pressure drop of the scrubber was out of range and had failed to maintain scrubber pressure logs at the MLC Facility.

61.     On June 11-12, 2013, EPA conducted an inspection of the MLC Facility.

62.     MLC operates a scrubber to control sulfur emissions and resulting odors on the outside oil processing tanks and dryer tanks at the MLC Facility.

63.     MLC operates a carbon box system as a secondary odor control system on the outside oil processing tanks and dryer tanks at the MLC Facility.  During EPA's 2013 inspection, plant personnel indicated MLC had not changed the carbon in this system for more than six years.

64.     Based on scrubber logs provided to EPA on June 14, 2013, the differential pressure (pressure drop) on MLC's scrubber fell below 1 inch of water for 356 days between March 1, 2011 and June 10, 2013.

65.     Between March 1, 2011, and June 10, 2013, MLC failed to restore operation of the scrubber to its normal operation in accordance with Condition D.2.3 of the 2015 FESOP and good air pollution control practices.

66.     Between March 1, 2011, and June 10, 2013, there were periods of time that MLC's scrubber pressure drop was below 1 inch of water for more than 21 consecutive days.

67.     MLC failed to maintain daily scrubber logs for January, February, and November of 2011 and April, May, November, and December of 2012.

68.     On September 26, 2013, EPA issued a Notice of Violation ("NOV") to MLC pursuant to the Act, 42 U.S.C. § 7413(a), for failing to take reasonable steps when the pressure drop of the scrubber was out of range and for failing to maintain scrubber pressure logs at the MLC Facility.

69.     On March 31-April 1, 2015, EPA conducted an inspection of the MLC Facility. During the inspection, MLC stated that the facility processes oil 7 days per week, 24 hours per day.

70.     During the March 31-April 1, 2015, inspection, EPA inspectors observed that the scrubber was not operating while the heated tanks were holding liquid and in operation.

71.     During the March 31-April 1, 2015, inspection, EPA inspectors observed that the pressure drop gauge on the scrubber was registering zero pounds per square inch ("psig").

72.     On July 22, 2015, EPA issued a Section 114 Request for Information, pursuant to the Act, 42 U.S.C. § 7414(a)(1), requiring MLC to conduct VOC and $SO_2$ emissions testing at the inlet and outlet to the Heated Tank Scrubber/Carbon Box Operation and to determine its removal efficiency

73.     On December 20-21, 2016, MLC conducted the required VOC and SO2 emissions testing at the inlet and outlet to the heated Tank Scrubber/Carbon Box Operation

74.     The stack test results showed that the Heated Tank Scrubber/Carbon Box system had a lower than expected and in some instances a negative control efficiency for VOCs and HAPs, and a $SO_2$ emission control efficiency of 78.3 percent.

75.     On January 20, 2017, MLC submitted its FESOP VOC, $SO_2$, and total HAPs Quarterly Report required by the 2015 FESOP and Limited Stay.

76.     In February 2017, MLC submitted supplementary data to EPA related to the VOCs tested and HAPs present in the waste materials identified in the report.

77.     In the January 2017 Quarterly Report, MLC stated that there were three deviations of the 2015 FESOP and Limited Stay permit requirements due to the scrubber being out of operation.

78.     The February 2017 supplementary data indicated that: (a) there were at least 240 occasions when the sample was analyzed for HAPs outside the method-defined hold time; and (b) there were more than 1,000 occasions when the sample concentration result for HAPs was measured below the minimum detection level ("MDL") and the final HAP concentration result reported was zero.

79. The January 20, 2017 stack test results for the December 20-21 test showed the presence of acetaldehyde and methanol in the emissions from the stack.

80. The January 2017 Quarterly Report and the reports submitted thereafter show that MLC has not been testing its incoming waste oil for acetaldehyde and methanol.

81. Failing to test for the presence of acetaldehyde and methanol in the emissions from the stack underestimates its emissions of these compounds and total HAPs.

82. According to EPA calculations based on the January 2017 Quarterly Report, MLC's HAP emissions were more than 24 tons based on a 12 consecutive month period.

83. Based on the January 2017 Quarterly Report, the Heated Tank Scrubber/Carbon Box system had a lower than expected and in some instances a negative control efficiency for VOCs and HAPs, and a $SO_2$ emission control efficiency of 78.3 percent. Additionally, the Heated Tank Scrubber/Carbon Box system did not maintain certain parameters within the ranges required by its permit.

84. On May 21, 2017, EPA issued a second NOV to MLC, pursuant to Section 113(a) of the Act, 42 U.S.C. § 7413(a), for emitting HAPs in excess of 24 tons per 12-month period, for failing to operate its Heated Tank Scrubber/Carbon Box system to control emissions when the heated processing tanks were operating on at least four occasions, for failing to determine the sulfur, VOCs, and HAPs content of each shipment of waste product, for failing to take response steps when the total static pressure drop across the scrubber was outside the required range, and for failing to maintain scrubber pressure logs.

85. On August 13, 2019, EPA issued a Section 114 Request for Information to MLC and ALS Environmental ("ALS"), pursuant to the Act, 42 U.S.C. § 7414(a)(1), requiring MLC

and ALS to provide data regarding liquid sampling and testing of incoming waste material at the MLC Facility from the period from October 1, 2016, to the date of the Request.

86.     On February 25, 2020, EPA issued a Section 114 Request for Information, pursuant to the Act, 42 U.S.C. § 7414(a)(1), requiring MLC to provide information regarding the amount of waste processed at the MLC Facility on a monthly basis for the period from November 24, 2015 through the date of the Request.

87.     Based on the January 2017 Quarterly Report, and MLC's responses to EPA's August 2019 and February 2020 Section 114 Requests, MLC became a major source emitting 25 tons per year or more of HAPs on or about December 31, 2014.

88.     Because MLC became a major source on or about December 31, 2014, MLC was required to submit to EPA an initial notification within 120 days thereafter (i.e. by April 30, 2015), to submit a Title V application one year thereafter (i.e. by December 31, 2015), and to comply with the control requirements of the Off-Site Waste NESHAP within three years of becoming subject to them (i.e. by December 31, 2017).

89.     Based on the January 2017 Quarterly Report, and MLC's responses to EPA's August 2019 and February 2020 Section 114 Requests, MLC has continued to emit HAPs in excess of 24 tons per twelve (12) consecutive month period.

**IDEM Enforcement**

90.     IDEM has issued three Enforcement Action Letters ("EALs") to MLC that generally cover the same violations as EPA as well as additional reporting and recordkeeping violations.

91.     In its October 13, 2017 EALs, IDEM cited a number of days when MLC was operating the tanks without the Heated Tank Scrubber/Carbon Box system operating based on

September 13 and 18, 2017 inspections by IDEM. The total days IDEM has cited are:  October 21, 2016; October 27, 2016; December 5, 2016; December 7, 2016; February 5, 2017; February 8, 2017; February 28, 2017; March 14, 2017; April 10, 2017; April 14, 2017; May 4, 2017; August 24, 2017; and September 10, 2017.

**Hazardous Air Pollution from the MLC Facility**

92.     In the January 2017 Quarterly Report, MLC identified at least 42 HAPs in waste coming in or being released through stack or fugitive emissions from the MLC Facility including xylenes, trichloroethene, toluene, tetrachloroethene, styrene, pyrene, phenol, phenanthrene, o-xylene, naphthalene, methylene chloride, methyl tert-butyl ether, m,p-xylene, isopropylbenzene, fluorine, fluoranthene, ethyl benzene, dibenzofuran, chrysene, chloromethane, chloroform, chlorobenzene, carbon tetrachloride, carbon disulfide, carbazole, bis (2-ethyhexyl) phthalate, benzo(a)anthracene (aka benz(a)anthracene), benzidine, benzene, anthracene, acetophenone, acenaphthylene, acenaphthene, 4-ethyl-2-pentanone, 4-aminobiphenyl, 2-methylphenol, 2-methylnapthlalene, 2,4-initrotoluene, 1-methylnapthalene, 1,4-dichlorobenzene, 1,2-dibromo-3 chloropropane, and 1,2,4-richlorobenzene. The 10 HAPs with the highest concentration were: m,p-xylene, ethylbenzene, 2-ethylnapthalene, o-xylene, phenol, bis(2-ethylhexyl) phthalate, toluene, 1-methynapthalene, phenanthrene, and naphthalene.

93.     The health effects of these HAPs may include irritation of the skin, eyes, nose, and throat, constriction of the chest, gastrointestinal and neurological effects, central nervous system effects, such as headache, dizziness, fatigue, tremors, and cancer.

94.      Most of the HAPs identified at the MLC Facility are VOCs, which contribute to the formation of ground-level ozone. Breathing ozone may contribute to a variety of health problems including chest pain, coughing, throat irritation, and congestion, and can worsen

bronchitis, emphysema, and asthma. Ground-level ozone also can reduce lung function and inflame lung tissue. Repeated exposure may permanently scar lung tissue.

95.     Short-term exposures to $SO_2$ can harm the human respiratory system and make breathing difficult. Children, the elderly, and those who suffer from asthma are particularly sensitive to effects of $SO_2$. $SO_2$ emissions that lead to high concentrations of $SO_2$ in the air generally also lead to the formation of other sulfur oxides ("$SO_X$"). $SO_X$ can react with other compounds in the atmosphere to form small particles. These particles contribute to particulate matter ("PM") pollution: particles may penetrate deeply into sensitive parts of the lungs and cause additional health problems.

### FIRST CLAIM FOR RELIEF
#### (FESOP: Condition D.1.1(e))
#### (42 U.S.C. §7413(a)(1))

96.     Paragraphs 1 through 92 are incorporated herein by reference.

97.     Since at least June 30, 2015, the Defendant has violated Condition D.1.1(e) of the 2015 FESOP and Limited Stay by exceeding the 24 tons per year limit of HAP emissions, with compliance determined at the end of each month.

98.     On May 31, 2017, the EPA issued an NOV in which it notified the Defendant of this violation.

99.     As a result of the Defendant's exceedance of the 24 tons per year limit of HAP emissions, unauthorized HAP emissions have occurred and are continuing to occur at the MLC Facility.

100.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable for injunctive relief and an assessment of a civil penalty from at least June 30, 2015, to November 2, 2015, in the amount of $37,500 per day for each such violation, and after

November 2, 2015, to the present in the amount of up to $109,024 per day for each such violation.

101.     As a result of the above-listed violations, pursuant to Ind. Code §§ 13-13-5-1, 13 13-5-2, and 13-30-4-1, the Defendant is liable to Indiana for injunctive relief and civil penalties not to exceed $25,000 per day for each violation.

**SECOND CLAIM FOR RELIEF**
**(FESOP: Conditions D.1.3 & D.1.4)**
**(42 U.S.C. § 7413(a)(1))**

102.     Paragraphs 1 through 92 are incorporated herein by reference.

103.     On numerous occasions as described above in paragraphs 84 and 89, the Defendant has violated Conditions D.1.3 and D.1.4 of the 2015 FESOP and Limited Stay by failing to operate its Heated Tank Scrubber/Carbon Box system to control emissions when its heated processing tanks were in operation.

104.     On May 31, 2017, the EPA issued an NOV in which it notified the Defendant of this violation.

105.     As a result of the Defendant's failure to operate its Heated Tank Scrubber/Carbon Box system to control emissions when its heated processing tanks were in operation, unauthorized emissions have occurred and are continuing to occur at the MLC Facility.

106.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable for injunctive relief and the assessment of a civil penalty of up to $37,500 per day for each violation occurring from January 12, 2009 until November 2, 2015, and $109,024 per day for each violation occurring after November 2, 2015.

107.    As a result of the above-listed violations, pursuant to Ind. Code §§ 13-13-5-1, 13 13-5-2, and 13-30-4-1, the Defendant is liable to Indiana for injunctive relief and civil penalties not to exceed $25,000 per day for each violation.

**THIRD CLAIM FOR RELIEF**
**(FESOP: Condition D.1.6)**
**(42 U.S.C. § 7413(a)(1))**

108.    Paragraphs 1 through 92 are incorporated herein by reference.

109.    On numerous occasions as described above, the Defendant has violated Condition D.1.6 of the 2015 FESOP and Limited Stay by failing to determine the sulfur, VOC, and HAPs content of each shipment of incoming waste material using ASTM standards for sampling and chemical analysis.

110.    On May 31, 2017, the EPA issued an NOV in which it notified the Defendant of this violation.

111.    As a result of the Defendant's failure to determine the sulfur, VOC, and HAPs content of each shipment of incoming waste material using ASTM standards for sampling and chemical analysis, unauthorized emissions may have occurred and may be continuing to occur at the MLC Facility.  Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable for injunctive relief and the assessment of a civil penalty of up to $109,024 per day for each violation occurring after November 2, 2015.

112.    As a result of the above-listed violations, pursuant to Ind. Code §§ 13-13-5-1, 13 13-5-2, and 13-30-4-1, the Defendant is liable to Indiana for injunctive relief and civil penalties not to exceed $25,000 per day for each violation.

**FOURTH CLAIM FOR RELIEF**
**(FESOP: Condition D.2.3)**
**(40 U.S.C. § 7413(a)(1))**

113.    Paragraphs 1 through 92 are incorporated herein by reference.

114.    On numerous occasions as described above, the Defendant has violated Condition D.2.3 of the 2008 and 2015 FESOPs and Limited Stay by failing to failing to respond when the pressure drop across its scrubber deviated from the required range of 1-4 inches of water.

115.    On September 26, 2013, and May 31, 2017, the EPA issued NOVs in which it notified the Defendant of this violation.

116.    As a result of the Defendant's failure to respond when the pressure drop across its scrubber deviated from the required range of 1-4 inches of water, unauthorized emissions may have occurred and may be continuing to occur at the MLC Facility.  Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable for injunctive relief and the assessment of a civil penalty of up to $37,500 per day for each violation occurring from January 12, 2009 until November 2, 2015, and $109,024 per day for each violation occurring after November 2, 2015.

117.    As a result of the above-listed violations, pursuant to Ind. Code §§ 13-13-5-1, 13 13-5-2, and 13-30-4-1, the Defendant is liable to Indiana for injunctive relief and civil penalties not to exceed $25,000 per day for each violation.

### FIFTH CLAIM FOR RELIEF
#### (FESOP: Condition D.2.3)
#### (40 U.S.C. § 7413(a)(1))

118.    Paragraphs 1 through 92 are incorporated herein by reference.

119.    On numerous occasions as described above, the Defendant has violated Conditions D.2.3 of the 2008 and 2015 FESOPs and Limited Stay by failing to keep daily scrubber pressure drop logs.

120.    On September 26, 2013, and May 31, 2017, the EPA issued NOVs in which it notified the Defendant of this violation.

121.    As a result of the Defendant's failure to keep daily scrubber pressure drop logs, unauthorized emissions may have occurred and may be continuing to occur at the MLC Facility. Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable for injunctive relief and the assessment of a civil penalty of up to $37,500 per day for each violation occurring from January 12, 2009 until November 2, 2015, and $109,024 per day for each violation occurring after November 2, 2015.

122.    As a result of the above-listed violations, pursuant to Ind. Code §§ 13-13-5-1, 13 13-5-2, and 13-30-4-1, the Defendant is liable to Indiana for injunctive relief and civil penalties not to exceed $25,000 per day for each violation.

**SIXTH CLAIM FOR RELIEF**
**(Off-Site Waste NESHAP)**
**(40 C.F.R. Part 63, Subpart DD)**

123.    Paragraphs 1 through 92 are incorporated herein by reference.

124.    Pursuant to 40 C.F.R. § 63.680(a)(1), the MLC Facility is a major source of HAP emissions as defined in 40 C.F.R. § 63.2 because the MLC Facility emits or has the potential to emit 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.

125.    Based on the MLC's January 2017 Quarterly Report, and MLC's responses to EPA's August 2019 and February 2020 Section 114 Requests, MLC became a major source subject to the Off-Site Waste NESHAP on or before December 31, 2014, and an initial notification was required 120 days, which was by April 30, 2015.

126.    MLC failed to submit an initial notification for the Off-Site Waste NESHAP to the EPA in accordance with the applicable notification requirements in 40 C.F.R. § 63.9 as specified in Table 2 of the Off-Site Waste NESHAP, in violation of 40 C.F.R. § 63.697(a)(1).

127.     MLC failed to notify the EPA in writing that the MLC Facility is subject to the relevant standard within 120 calendar days after the effective date of the relevant standard as required by 40 C.F.R. § 63.9(b)(2).

128.     On May 31, 2017, the EPA issued an NOV in which it notified the Defendant of these violations.

129.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable for injunctive relief and assessment of a civil penalty from at least April 30, 2015, to November 2, 2015, in the amount of $37,500 per day for each such violation, and after November 2, 2015, to the present in the amount of up to $109,024 per day for each such violation.

130.     As a result of the above-listed violations, pursuant to Ind. Code §§ 13-13-5-1, 13 13-5-2, and 13-30-4-1, the Defendant is liable to Indiana for injunctive relief and civil penalties not to exceed $25,000 per day for each violation.

### SEVENTH CLAIM FOR RELIEF
### (Title V)
### (40 C.F.R. § 70.5(a)(1))

131.     Paragraphs 1 through 92 are incorporated herein by reference.

132.     State operating permit program conditions at 40 C.F.R. § 70.5(a)(1) require that an application for a source applying for a part 70 permit for the first time be submitted within 12 months after the source becomes subject to the permit program.

133.     The MLC Facility became a major source of both HAPs and $SO_2$ by no later than December 31, 2014.

134.    The Defendant has violated 40 C.F.R. § 70.5(a)(1) by failing to apply for and obtain a Part 70 permit by no later than December 31, 2015, 12 months after it became subject to the Title V permit program.

135.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable for injunctive relief and assessment of a civil penalty of up to $109,024 per day for each violation occurring after November 2, 2015.

136.    As a result of the above-listed violations, pursuant to Ind. Code §§ 13-13-5-1, 13 13-5-2, and 13-30-4-1, the Defendant is liable to Indiana for injunctive relief and civil penalties not to exceed $25,000 per day for each violation.

## RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully prays that this Court:

A.    Enter judgment against the Defendant and in favor of the United States and Indiana, and assess against the Defendant a civil penalty in an amount of up to $37,500 per day for each violation occurring until November 2, 2015, and $109,024 per day for each violation occurring after November 2, 2015, pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b).

B.    Assess a civil penalty against Defendant, and enter judgment against Defendant and in favor of the State of Indiana, in an amount of up to $25,000 per day for each violation of the permits issued by IDEM under air pollution control laws, pursuant to Ind. Code § 13-30-4-1;

B.    Award the United States and Indiana injunctive relief pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b); and Ind. Code § 13-13-5;

C.    Grant such other relief as this Court may deem just and proper.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

Dated:  August 4, 2022

*Richard Gladstein*
**RICHARD GLADSTEIN**
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-1711
Richard.Gladstein@usdoj.gov

Dated: August 4, 2022

*Shelese Woods*
**SHELESE WOODS**
Assistant United States Attorney United
States Attorney's Office 10 West
Market Street, Suite 2100
Indianapolis, IN 46204
317-226-6333
shelese.woods@usdoj.gov

Of Counsel:

**ROBERT M. PEACHEY**
Office of Regional Counsel
U.S. EPA Region 5 (C-14J)
77 W. Jackson Blvd.
Chicago, Illinois 60604
Phone: (312) 353.4510
Fax: (312) 692.2422
E-mail: peachey.robert@epa.gov

**FOR THE STATE OF INDIANA**

Dated: _08/03/2022_

**ALEKSANDRINA PRATT**
Deputy Attorney General
Administrative & Regulatory Enforcement Litigation
Office of Attorney General Todd Rokita
302 West Washington Street
IGCS 5th Floor
Indianapolis, Indiana  46204
(317) 232-4849
Aleksandrina.Pratt@atg.in.gov