IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTHERN DISTRICT OF INDIANA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

     and

THE STATE OF INDIANA,

             Plaintiffs,

       v.

                                          Civil No.1:22-cv-01560-JMS-DLP

METALWORKING LUBRICANTS COMPANY,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CONSENT DECREE**

TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................ 3
II.     APPLICABILITY ................................................................................................... 3
III.    DEFINITIONS........................................................................................................ 6
IV.     CIVIL PENALTY ................................................................................................... 8
V.      COMPLIANCE REQUIREMENTS........................................................................ 9
VI.     SURVIVAL OF CONSENT DECREE REQUIREMENTS.................................... 26
VII.    REPORTING REQUIREMENTS .......................................................................... 27
VIII.   STIPULATED PENALTIES ................................................................................. 37
IX.     FORCE MAJEURE ............................................................................................... 34
X.      DISPUTE RESOLUTION ..................................................................................... 36
XI.     INFORMATION COLLECTION AND RETENTION ........................................... 39
XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ................................ 41
XIII.   COSTS .................................................................................................................. 43
XIV.    NOTICES.............................................................................................................. 43
XV.     EFFECTIVE DATE .............................................................................................. 45
XVI.    RETENTION OF JURISDICTION ....................................................................... 45
XVII.   MODIFICATION .................................................................................................. 45
XIII.   TERMINATION .................................................................................................... 46
XIX.    PUBLIC PARTICIPATION .................................................................................. 47
XX.     SIGNATORIES/SERVICE.................................................................................... 47
XXI.    INTEGRATION .................................................................................................... 48
XXII.   FINAL JUDGMENT ............................................................................................. 48
XXIII.  26 U.S.C. SECTION 162(F)(2)(A)(II) ................................................................. 48
XXIV.   APPENDICES ...................................................................................................... 48

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Indiana ("Indiana" or the "State") on behalf of the Indiana Department of Environmental Management ("IDEM") (collectively, "Plaintiffs") have filed a Complaint in this action concurrently with this Consent Decree, pursuant to Section 113 of the Clean Air Act (the "Act"), 42 U.S.C. § 7413, and pursuant to Title 13 of the Indiana Code and Title 326 of the Indiana Administrative Code, alleging that Defendant, Metalworking Lubricants Company ("Defendant"), violated its Federally Enforceable State Operating Permits ("FESOPs") issued in 2008 and 2015; the National Emissions Standards for Hazardous Air Pollutants for Off-Site Waste and Recovery Operations (Off-Site Waste "NESHAP"), 40 C.F.R. Part 63, Subpart DD; and Title V of the Act, 42 U.S.C. § 7661a. The Complaint alleges that the above violations took place at Defendant's waste oil/water recycling facility located at 1509 South Senate Avenue in Indianapolis, Indiana.

The Complaint specifically alleges that Defendant violated its FESOPs by: (1) exceeding the 24 tons per year limit of hazardous air pollutant ("HAP") emissions in violation of the 2015 FESOP and Stay; (2) failing to operate its scrubber/carbon box control device on October 27, 2016, December 5, 2016, and December 7, 2016, when its processing tanks were in operation; (3) failing to determine the sulfur, Volatile Organic Compound ("VOC"), and HAPs content of each shipment of incoming waste material using American Society for Testing and Materials ("ASTM") standards for sampling and chemical analysis in violation of the 2015 FESOP and Stay; (4) failing to respond when the pressure drop across its scrubber deviated from the required range for 357 days; and (5) failing to maintain scrubber pressure drop logs for January, February, and November of 2011, and April, May, November, and December of 2012. The Complaint also alleges that Defendant failed to submit an initial notification under the Off-Site Waste NESHAP

1

and failed to obtain a Title V permit to operate as a major source. The Complaint alleges that these violations resulted in excess emissions of organic HAPs and VOCs.

IDEM has issued three Enforcement Action Letters ("EALs") — (1) May 26, 2016; (2) October 27, 2016; and (3) October 13, 2017— to Defendant that generally cover the same violations as alleged in the Complaint, as well as additional reporting and recordkeeping violations. In addition, EPA has issued (1) a September 26, 2013, Notice of Violation; (2) a July 24, 2015, § 114(a) Request for Information; and (3) a May 31, 2017, Notice and Finding of Violation to Defendant that generally cover the same violations as alleged in the Complaint, as well as additional reporting and recordkeeping violations. The violations alleged in the EALs and the EPA correspondence listed above are included in the Complaint and are resolved by this Consent Decree through the date of lodging.

Defendant does not admit that the alleged violations occurred and does not admit any liability to the United States or the State arising out of the transactions or occurrences alleged in the Complaint.

The United States, the State, and the Defendant (the "Parties") recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

2

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action, pursuant to

28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b), and

over the Parties. This Court has supplemental jurisdiction over the State law claims asserted by

the State of Indiana pursuant to 28 U.S.C. § 1367. Venue lies in this District pursuant to Section

113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c), and 1395(a), because

the violations alleged in the Complaint are alleged to have occurred in, and Defendant conducts

business in, this judicial district.

2.      For purposes of this Consent Decree, or any action to enforce this Consent

Decree, Defendant consents to the Court's jurisdiction over this Consent Decree and any such

action and over Defendant and consents to venue in this judicial district.

3.      For purposes of this Consent Decree, Defendant agrees that the Complaint states

claims upon which relief may be granted pursuant to Section 113(b) of the Act, 42 U.S.C.

§ 7413(b).

## II.    APPLICABILITY

4.      The obligations of this Consent Decree apply to and are binding upon the United

States and the State, and upon Defendant and any successors, assigns, or other entities or persons

otherwise bound by law.

5.      No Transfer, whether in compliance with the procedures of this Paragraph or

otherwise, relieves Defendant of its obligation to ensure that the terms of this Decree are

implemented, unless (i) the transferee agrees to undertake the obligations required by this

Consent Decree and to be substituted for Defendant as a Party under this Decree and thus bound

by the terms hereof, (ii) the United States and the State consent to relieve Defendant of its

3

obligations.  The United States' decision to refuse to approve the substitution of the transferee for the Defendant shall not be subject to judicial review.  At least 30 Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region 5, the United States Attorney for the Southern District of Indiana, and the United States Department of Justice, in accordance with Section XIV of this Decree (Notices).  Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

6.     Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.  Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

7.     In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

III.     DEFINITIONS

8.     Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"CAS" shall mean the Carbon Adsorption System installed, maintained, operated, and continuously monitored as set forth in this Consent Decree.

4

"Complaint" shall mean the complaint filed by the United States and the State in this action;

"Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Paragraph 97);

"Continuous monitoring system" is a comprehensive term that includes the total equipment required to meet the data acquisition and availability requirements of this Consent Decree, used to sample, analyze and provide a record of emissions or process and control parameters in order to demonstrate compliance with this Decree on a continuous basis as defined by this Decree.

"Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, federal holiday, or state holiday, the period shall run until the close of business of the next business day;

"Defendant" shall mean Metalworking Lubricants Company;

"Effective Date" shall have the definition provided in Section XV;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Emergency" as defined in 326 IAC 2-7-1(12) shall mean any situation, including acts of God, arising from sudden and reasonably unforeseeable events beyond the reasonable control of the source that: (A) requires immediate corrective action to restore normal operation; and (B) causes the source to exceed an emission limit under a Part 70 permit due to unavoidable increases in emissions attributable to the emergency. The term shall not include noncompliance to the extent caused by improperly designed equipment, failure to implement an adequate

5

preventive maintenance plan, careless or improper operation, or operator error. For purposes of this Decree, the failure to change out the carbon or carbon canister in the CAS in accordance with the time frames outlined in this Decree and the failure to maintain the organic compound concentration of the gas stream exiting the CAS below the organic breakthrough concentration are not "emergencies" under this definition, and these failures would constitute violations of this Decree.

"Facility" shall mean Defendant's waste oil/water recycling facility located at 1509 South Senate Avenue in Indianapolis, Indiana;

"FESOP" shall mean the Federally Enforceable State Operating Permit Renewal No. F097-32513-00139 issued to MLC by IDEM on June 25, 2015 and all subsequent amendments.

"Oil-water separator" shall mean a separator as defined in this Decree that is used to separate oil from water.

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral;

"Parties" shall mean the United States, the State, and Defendant;

"Replacement Carbon Ordering Interval" shall mean the predetermined regular time interval for ordering replacement carbon based on the total carbon working capacity of the CAS and emission load operating schedule and/or other factors that will ensure that replacement carbon is on-site at the time that the exhaust stream from the CAS reaches carbon breakthrough, and that has been approved by EPA and IDEM pursuant to Paragraph 24.

"Safety Device" shall mean a closure device such as a pressure relief valve, frangible disc, fusible plug, or any other type of device which functions to prevent physical damage or permanent deformation to equipment by venting gases or vapors during unsafe conditions resulting from an unplanned, accidental, or emergency event. For the purpose of this Decree, a safety device is not used for routine venting of gases or vapors from the vapor headspace

6

underneath a cover such as during filling of the unit or to adjust the pressure in this vapor headspace in response to normal daily diurnal ambient temperature fluctuations. A safety device is designed to remain in a closed position during normal operations and open only when the internal pressure, or another relevant parameter, exceeds the device threshold setting applicable to the equipment as determined by the owner or operator based on manufacturer recommendations, applicable regulations, fire protection and prevention codes, standard engineering codes and practices, or other requirements for the safe handling of flammable, combustible, explosive, reactive or hazardous materials.

"Section" shall mean a portion of this Consent Decree identified by a roman numeral;

"Separator" shall mean a waste management unit, generally a tank, used to separate oil or organics from water. A separator consists of not only the separation unit but also the forebay and other separator basins, skimmers, weirs, grit chambers, sludge hoppers, and bar screens that are located directly after the individual drain system and prior to any additional treatment units such as an air flotation unit clarifier or biological treatment unit. Examples of a separator include, but are not limited to, an API separator, parallel-plate interceptor, and corrugated-plate interceptor with the associated ancillary equipment.

"State" shall mean the State of Indiana;

"Stay" shall mean the agreement entered into by IDEM and MLC on September 26, 2016 and effective September 26, 2016, to stay certain requirements of FESOP 097-32513-0013.

"United States" shall mean the United States of America, acting on behalf of EPA.

IV.    CIVIL PENALTY

9.    Within 60 Days after the Effective Date, Defendant shall pay the sum of $155,000 as a civil penalty to the United Sates, together with interest accruing from the date on which the

Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

10.    The Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Southern District of Indiana shall provide to Defendant, in accordance with Section XIV (Notices), instructions for making this payment, including a Consolidated Debt Collection System ("CDCS") reference number. Defendant shall make such payment at https://www.pay.gov in accordance with the FLU's instructions, including references to the CDCS Number. Defendant shall send notices of this payment to DOJ and EPA in accordance with Section XIV (Notices).

11.    Defendant shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section VIII (Stipulated Penalties) in calculating its federal, State, or local income tax.

12.    No later than 90 Days after the Effective Date, Defendant shall pay a civil penalty of $155,000 to the State by check, payable to: "Environmental Management Special Fund." At the time of payment, Defendant shall send the check, together with a transmittal letter by mail, to:

> Indiana Department of Environmental Management
> Accounts Receivable
> IGCN, Rm. N1340
> 100 North Senate Avenue
> Indianapolis, Indiana 46204

## V.    COMPLIANCE REQUIREMENTS

13.    By no later than May 31, 2023, MLC shall install, maintain, operate and continuously monitor as set forth in this Decree a Carbon Adsorption System ("CAS") to control Total Organic Compounds ("TOC") and HAPs at the Facility.  By no later than December 15,

8

2022, MLC shall submit to EPA and IDEM for review and approval the manufacturer's specifications for the proposed CAS.  The CAS shall be installed downstream of the existing hypochlorite injection scrubber ("Scrubber") used to control sulfur dioxide ("$SO_2$") emissions, so that all gases and vapors exiting the Scrubber are controlled by the CAS. The Scrubber and CAS installed and operating in sequence shall together constitute the "Emission Control System" at the Facility.

14.     By no later than May 31, 2023, MLC shall install new tanks, oil-water separators, piping and/or ductwork, as needed, and make repairs to the existing tanks, oil-water separators, piping and/or ductwork, as needed, to ensure that the following tanks and oil-water separators are covered by fixed roofs and vented directly through a closed-vent system to the Emission Control System in accordance with the requirements of this Decree, including Paragraphs 16(a-d), 17(a-c), and as shown in Appendix 1:

a.     All existing, new, and replacement oil processing tanks (P-tanks);

b.     Tank SHT2 and all existing, new, and replacement tanks that operate in the same manner as SHT2 (i.e. process oil and water by injecting chemicals, heating and separating oil and water);

c.     All existing, new, and replacement water processing tanks, including but not limited to W2 through W8;

d.     All existing, new, and replacement dryers (heated product tanks), including but not limited to D1 through D5;

e.     The Big Pit, as designated in the FESOP, if it is operating as an oil-water separator and/or is heated.

9

15.     By no later than October 31, 2022, MLC shall permanently remove the K heated product tanks, including but not limited to K1 through K3.

16.     The tanks and oil-water separators listed in Paragraph 14 above, shall meet the following requirements:

a.     The fixed roof and its closure devices shall be designed to form a continuous barrier over the entire surface area of the liquid in the tank or separator;

b.     Each opening in the fixed roof not vented to the Emission Control System shall be equipped with a closure device.  The closure devices shall be designed to operate such that, if the pressure in the vapor headspace underneath the fixed roof is less than atmospheric pressure when the Emission Control System is operating, and the closure device is secured in the closed position, there are no visible cracks, holes, gaps, or other open spaces in the closure device or between the perimeter of the cover opening and the closure device. Alternatively, if the pressure in the vapor headspace underneath the fixed roof is equal to or greater than atmospheric pressure when the Emission Control System is operating, the closure device shall be designed to operate with no detectable organic emissions.

c.     The fixed roof and its closure devices shall be made of suitable materials that will minimize exposure of the material in the tank or separator to the atmosphere, to the extent practical, and will maintain the integrity of the equipment throughout its intended service life. Factors to be considered when selecting the materials for and designing the fixed roof and closure devices shall include: organic vapor permeability; the effects of any contact

10

with the liquid and its vapor managed in the tank or separator; the effects of outdoor exposure to wind, moisture, and sunlight; and the operating practices used for the tank or separator on which the fixed roof is installed.

d.   Whenever material is in the tank or separator, the fixed roof shall be installed with each closure device secured in the closed position, and the vapor headspace underneath the fixed roof shall be vented to the Emission Control System.  All overflow pipes and vent must be welded closed.  As an exception to the requirements in this subparagraph, MLC may remove a fixed roof, open a closure device, or not vent to the Emission Control System under the following circumstances:

(1)     To provide access to the tank or separator for performing routine inspection, maintenance, or other activities needed for normal operations.  Examples of such activities include those times when a worker needs to open a port to sample liquid in the tank, or when a worker needs to open a hatch to perform maintenance on or repair equipment. Following completion of the activity, MLC shall promptly secure the closure device in the closed position or reinstall the cover, as applicable, to the tank;

(2)     To remove accumulated sludge or other residues from the bottom of the tank; or

(3)     Opening of a safety device, as defined in 40 C.F.R. § 63.1041, is allowed at any time if necessary to avoid an unsafe condition resulting from an unplanned, accidental, or emergency

11

event. A safety device is not used for routine venting of gases or vapors from the vapor headspace underneath a cover such as during filling of the unit. A safety device is designed to remain in a closed position during normal operation.

(4)    An Emergency as defined in Section III.

e.    MLC shall inspect and monitor the tanks and separators listed in Paragraph 14 in accordance with the procedures specified in Appendix 2 of this Decree.

f.    If heated, the fluid in the tanks and oil-water separators shall not exceed a temperature of 210 degrees Fahrenheit (° F).

17.    MLC shall ensure that the closed-vent system required by this Decree is designed, operated, and maintained to meet the following requirements:

a.    It must be designed to operate with no detectable organic emissions; or

b.    It must be designed to operate at a pressure below atmospheric pressure.  It shall be equipped with at least one pressure gauge or other pressure measurement device that can be read from a readily accessible location to verify that negative pressure is being maintained in the closed-vent system when the Emission Control System is operating.

c.    It shall not include any bypass devices used to divert a vent stream from the closed-vent system to the atmosphere at a point upstream of the Emission Control System inlet.

d.    MLC shall inspect and monitor the closed-vent system in accordance with the requirements of Appendix 3 of this Decree.

12

18.     The Emission Control System must achieve the following performance specifications and requirements:

a.     Recover 95 percent or more, on a weight basis, of the TOC, less methane and ethane, contained in the vent stream entering the Emission Control System, as verified through the performance testing requirements outlined in Appendix 4.

b.     Remove $SO_2$ emissions contained in the vent stream entering the Emission Control System in order to achieve outlet $SO_2$ emissions from the Emission Control System of no greater than 8 lb/hour, as verified through the performance testing requirements outlined in Appendix 4.

c.     MLC must route the vapors from all tanks and oil-water separators listed in Paragraph 14 through the closed-vent system to the Emission Control System at all times except as described in Paragraph 16.d.

d.     Whenever the gases or vapors from the tanks and oil-water separators listed in Paragraph 14 are routed through the closed-vent system to the Emission Control System, the Emission Control System must be operating, except in the following situations:

(1)     an emergency, as defined in Section III; or

(2)     When MLC is changing out the carbon or carbon cannister in the CAS;

(3)     When any part of the Emission Control System is not operating or malfunctioning, MLC shall follow the Malfunction Abatement Plan approved by IDEM and included in Appendix 7 and the

13

Operation and Maintenance (O&M) Plan required by Paragraph 25 of this Decree.

e.    The CAS shall consist of an activated carbon cannister or carbon box. MLC shall monitor the concentration levels of the organic compounds in the exhaust vent stream from the CAS using a fixed detector that continuously measures organic compound concentration. Measurements of the organic compound concentrations exiting the CAS shall be made with a detection instrument that is appropriate for the composition of organic constituents in the exhaust vent stream, the range of organic concentrations, and is routinely calibrated to measure the organic concentration levels expected to occur at breakthrough. MLC shall use a data logger to electronically record the concentration of organics every 15 minutes. The data logger's electronic concentration records must be maintained for 5 years. The fixed detector and data logger specifications are included in Appendix 6 of this Decree.

f.    MLC shall use engineering methods, design data, test data, manufacturer's recommendations and/or pilot studies to establish: the organic breakthrough concentration of the gases exiting the CAS, the organic concentration detector calibration practices, and the time interval for ordering replacement carbon (replacement carbon ordering interval) based on the total carbon working capacity of the CAS and emission load operating schedule and/or other factors. MLC's replacement carbon ordering interval shall be sufficiently frequent to ensure that replacement carbon is on-site whenever

14

the CAS outlet vent stream organic concentration reaches breakthrough as measured by the fixed detector. MLC shall submit the organic breakthrough concentration, the replacement carbon ordering interval and the calibration practices to EPA and IDEM for approval as set forth in Paragraph 24, below.

g.    MLC shall replace either the existing canister with a new carbon canister or replace the existing carbon in the CAS with fresh carbon as soon as the organic concentration measured by the fixed detector at the CAS exhaust stream reaches the carbon breakthrough concentration. MLC shall complete the changeout immediately but no later than 12 hours after the CAS exhaust stream organic concentration reaches carbon breakthrough. For each carbon changeout, MLC must record the date, time, and duration of each changeout and the organic concentration of the exhaust stream from the CAS at the time of changeout.

h.    MLC must cease production while the carbon is being changed out. Ceasing production, at a minimum, means that MLC must shut off the heat to the tanks, stop all tank agitation and stop loading all materials to the tanks until the carbon is completely changed out and the gas steam is re-connected to the CAS in accordance with the Malfunction Abatement Plan approved by IDEM and the O&M Plan required by Paragraph 25 of this Decree.

i.    MLC shall install a visual and/or audible alarm on the fixed detector for organic concentration. The alarm shall activate when the organic concentration measured by the fixed detector at the exhaust stream from the

15

CAS reaches carbon breakthrough. MLC must maintain records of the dates, times and durations when the organic concentration fixed detector alarm activates along with the associated organic concentrations and corrective actions taken.

j.      The failure of MLC to order carbon replacement by the replacement carbon ordering interval constitutes a violation of this Decree in accordance with Paragraph 18.f of this Decree.

k.      The failure of MLC to changeout the carbon when the exhaust stream from the CAS reaches carbon breakthrough in accordance with Paragraph 18.g of this Decree constitutes a violation of this Decree.

l.      The failure of MLC to follow the Malfunction Abatement Plan or the O&M Plan during carbon changeouts or during periods of malfunction or non-operation of the Emission Control System constitutes a violation of this Decree.

m.      The spent carbon removed from the CAS must be either regenerated, reactivated, or burned as follows:

   (1)      Regenerated or reactivated in a thermal treatment unit for which the owner or operator has been issued a final permit under 40 C.F.R. part 270 that implements the requirements of 40 C.F.R. part 264, subpart X;

   (2)      Regenerated or reactivated in a thermal treatment unit equipped with and operating organic air emission controls in accordance with a national emission standard for hazardous air

pollutants under a subpart in 40 C.F.R. part 63 or 40 C.F.R. part 61;

(3)    Burned in a hazardous waste incinerator for which the owner or operator has been issued a final permit under 40 C.F.R. part 270 that implements the requirements of 40 C.F.R. part 264, subpart O;

(4)    Burned in a hazardous waste incinerator for which the owner or operator has designed and operates the incinerator in accordance with the interim status requirements of 40 C.F.R. part 265, subpart O;

(5)    Burned in a boiler or industrial furnace for which the owner or operator has been issued a final permit under 40 CFR part 270 that implements the requirements of 40 CFR part 266, subpart H; or

(6)    Burned in a boiler or industrial furnace for which the owner or operator has designed and operates the unit in accordance with the interim status requirements of 40 CFR part 266, subpart H.

19.    Within 120 days of the CAS becoming operational, MLC shall conduct performance testing of the TOC emissions, less methane and ethane, and the $SO_2$ emissions from the Emission Control System in accordance with the test methods and procedures outlined in Appendix 4 to this Decree in order to demonstrate that the Emission Control System complies with the performance specifications of Paragraph 18, above and to establish limits for the operating parameters listed in Paragraph 23, below.

17

20.    By no later than October 31, 2022, MLC shall ensure that the following tanks, which are shown in the diagram in Appendix 1, meet the fixed roof requirements outlined in Paragraph 21:

      a.    All existing, new and replacement FET tanks, including FET2 through FET4; (does not include FET1)

21.    The tanks listed in Paragraph 20 shall be equipped with a fixed roof designed to meet the following specifications:

      a.    The fixed roof and its closure devices shall be designed to form a continuous barrier over the entire surface area of the liquid in the tank. The fixed roof may be a separate cover installed on the tank (e.g., a removable cover mounted on an open-top tank) or may be an integral part of the tank structural design (e.g., a horizontal cylindrical tank equipped with a hatch);

      b.    The fixed roof shall be installed in a manner such that there are no visible cracks, holes, gaps, or other open spaces between roof section joints or between the interface of the roof edge and the tank wall;

      c.    Each opening in the fixed roof, and any manifold system associated with the fixed roof, shall be equipped with a closure device designed to operate such that when the closure device is secured in the closed position, there are no visible cracks, holes, gaps, or other open spaces in the closure device or between the perimeter of the opening and the closure device;

      d.    The fixed roof and its closure devices shall be made of suitable materials that will minimize exposure of the material in the tank to the atmosphere, to the extent practical, and will maintain the integrity of the equipment

18

throughout its intended service life. Factors to be considered when selecting the materials for and designing the fixed roof and closure devices shall include: organic vapor permeability; the effects of any contact with the liquid and its vapors managed in the tank; the effects of outdoor exposure to wind, moisture, and sunlight; and the operating practices used for the tank on which the fixed roof is installed.

e.    Whenever material is in the tank, the fixed roof shall be installed with each closure device secured in the closed position except as follows:

(1)    Opening of closure devices or removal of the fixed roof is allowed to provide access to the tank for performing routine inspection, maintenance, or other activities needed for normal operations. Examples of such activities include those times when a worker needs to open a port to sample the liquid in the tank, or when a worker needs to open a hatch to perform maintenance on or repair equipment. Following completion of the activity, MLC shall promptly secure the closure device in the closed position or reinstall the cover, as applicable, to the tank;

(2)    To remove accumulated sludge or other residues from the bottom of the tank;

(3)    Opening of a spring-loaded pressure-vacuum relief valve, conservation vent, or similar type of pressure relief device which vents to the atmosphere is allowed during normal operations for the purpose of maintaining the tank internal pressure in accordance

19

with the tank design specifications. The device shall be designed to operate with no detectable organic emissions when the device is secured in the closed position. The settings at which the device opens shall be established such that the device remains in the closed position whenever the tank internal pressure is within the internal pressure operating range determined by the owner or operator based on the tank manufacturer recommendations, applicable regulations, fire protection and prevention codes, standard engineering codes and practices, or other requirements for the safe handling of flammable, combustible, explosive, reactive, or hazardous materials. Examples of normal operating conditions that may require these devices to open are when the container internal pressure exceeds the internal pressure operating range for the tank because of loading operations or diurnal ambient temperature fluctuations.

    (4)    In case of an Emergency as defined by Section III.

f.    MLC shall inspect the tanks listed in Paragraph 20 in accordance with the requirements specified in Appendix 2 of this Decree.

22.    MLC shall monitor the operation of the CAS, as follows and in accordance with Appendix 5.

a.    Consistent with Paragraph 18, MLC shall install and operate a fixed detector to continuously measure organic concentration in the exhaust stream exiting the CAS and a data logger to electronically record the concentration of the

20

organic compounds in the exhaust stream exiting the CAS. MLC shall

install a visual and/or audible alarm on this fixed detector that activates

when the organic concentration in the exhaust stream from the CAS reaches

organic breakthrough concentration.

23.     MLC shall monitor the operation of the tanks, oil-water separators, and Scrubber

using mechanical monitoring to measure and manually record during facility operation the

following operating parameters, six times per day and spaced out every 4 hours, using the

procedures set forth in Appendix 5:

      a.     Pressure drop across the Scrubber;

      b.     The pH of the scrubber water;

      c.     Free chlorine concentration;

      d.     Scrubber water flow rate;

      e.     Verification of operation of scrubber fan and pump;

      f.     Bleach tank level and bleach tank flow rate;

      g.     Presence of overflow; and

      h.     Operating temperature of each tank and oil-water separated vented to the

           Emission Control System.

24.     By no later than February 28, 2023, MLC shall establish and submit to EPA and

IDEM for review and approval: the location, operating practices and calibration practices for the

fixed organic detector, data logger and alarm system for organic concentration, the organic

breakthrough concentration value at the exhaust stream from the CAS, and the replacement

carbon ordering interval. MLC must provide as part of its submittal all information and data,

including but not limited to, engineering studies, pilot studies, manufacturer's data, design data and test data used to determine these values.

25.    By no later than May 31, 2023, MLC shall develop and submit to EPA and IDEM for review and approval a written operation and maintenance ("O&M") plan that MLC shall follow. The plan shall describe in detail, procedures for operating and maintaining MLC's tanks, oil-water separators, closed-vent system, the Emission Control System, and monitoring equipment during periods of emergency, as defined in Section III; a program of corrective actions for emergencies involving the tanks, oil-water separators, closed-vent system, Emission Control System, and monitoring equipment; recordkeeping and reporting requirements for tracking emergencies that may occur in the tanks, oil-water separators, closed-vent system, Emission Control System, and monitoring equipment; and a program of inspection and preventative maintenance for the tanks, oil-water separators, closed-vent system, Emission Control System, and monitoring equipment. The O&M plan does not need to address any scenario that would not cause the source to exceed an applicable emission limitation in the Decree.  The purpose of the O&M plan is to:

a.    Ensure that, at all times, MLC operates and maintains its tanks, oil-water separators, closed-vent system, Emission Control System, and monitoring equipment in a manner which satisfies the general duty to minimize emissions at all times;

b.    Ensure that MLC is prepared to correct emergencies as soon as practicable after their occurrence in order to minimize excess emissions of VOC and hazardous air pollutants.

22

26.     Within 90 days after the Effective Date, MLC shall submit an application to modify the FESOP to include the installation and operation of the CAS.

27.     <u>Approval of Deliverables</u>.  After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA and IDEM shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

28.     If the submission is approved pursuant to Paragraph 27, Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part pursuant to Paragraph 27(b) or (c), Defendant shall, upon written direction from EPA and the State, take all actions required by the approved plan, report, or other item that EPA after consultation with the State determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section X (Dispute Resolution).

29.     If the submission is disapproved in whole or in part pursuant to Paragraph 27(c) or (d), Defendant shall, within 45 days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.

30.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA after consultation with the State may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, subject to Defendant's right to

invoke Dispute Resolution and the right of EPA and the State to seek stipulated penalties as provided in the preceding Paragraphs.

31.     Any stipulated penalties applicable to the original submission, as provided in Section VIII, shall accrue during the 45 day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

32.     <u>Permits</u>.  Once MLC has met the requirements of Paragraph 19, above, IDEM will revise Defendant's permit to eliminate the liquid testing requirements and all corresponding emission calculations and reporting requirements (D.1.6–D.1.9, D.1.16, D.1.17) and eliminate the continuous emissions monitoring system requirement and all corresponding reporting requirements (D.1.1.10, D.1.15, D.1.16(g), and D.1.17) contained in the FESOP. Where any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.  Defendant may seek relief under the provisions of Section IX (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

VI.    SURVIVAL OF CONSENT DECREE REQUIREMENTS

33.    Before beginning construction of the CAS described in Section V, and ten (10) days after the Effective Date, MLC shall submit a request for a source-specific SIP revision, to include the following Consent Decree provisions:

    a.    The requirement to operate the Emission Control System and to meet the performance specifications and requirements of Paragraphs 18 and 19, including the test methods and procedures outlined in Appendix 4 of this Decree;

    b.    The requirements for MLC's existing, new, and replacement tanks that are vented to the Emission Control System at Paragraph 14, including the requirement to inspect and monitor the tanks and separators in accordance with the procedures specified in Appendix 2 of this Decree;

    c.    The design, operation, and maintenance requirements for MLC's closed-vent system at Paragraph 17, including the requirement to inspect and monitor the closed-vent system in accordance with the procedures specified in Appendix 3 of this Decree;

    d.    The requirements for MLC's existing, new and replacement tanks that are not vented to the Emission Control System, listed in Paragraph 20, to comply with the fixed roof design requirements of Paragraph 21 and the inspection and monitoring requirements of Appendix 2;

    e.    The requirement to monitor the operation of the CAS in accordance with Paragraph 22 and Appendix 5, and the requirement to monitor the operation of the tanks, oil-water separators, and Scrubber in accordance with

25

Paragraph 23 and Appendix 5.

34.    Defendant shall not include the Force Majeure and Dispute Resolution Sections of this Consent Decree (Sections IX and X) in any application for a FESOP and/or Title V permit or request for a site-specific amendment to the Indiana SIP. For any requirement in this Consent Decree that provides for EPA approval of or comment on a submission, plan, or variance, the permit application shall propose that after termination of the Consent Decree, IDEM shall be substituted for EPA as the approving authority.

35.    The requirements set forth in Paragraph 33 survive termination of this Consent Decree.

## VII.    REPORTING REQUIREMENTS

36.    In addition to satisfying any reporting and submission requirements under its FESOPs, Defendant shall submit the following reports:

a.    By July 31st and January 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XVIII, Defendant shall submit by electronic mail a semi-annual report for the preceding six months that shall include a discussion of progress towards, or completion of, compliance milestones (including those described in Section V and/or Appendices 1-5); problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; and operation and maintenance. The report shall also include all records created in the reporting period for tank and oil-water separator inspections and their corrective actions described in Appendix 2; all records created in the reporting period for the closed-vent inspection and defect repair described in Appendix 3; all records and underlying data from the reporting period for the operating parameter monitoring

required in Paragraph 23; and the total time for the reporting period when the closed-vent system or Emission Control System was inoperable, or when the tanks and oil-water separators were not vented to the Emission Control System, and an explanation for each instance of inoperation or failure to vent to the Emission Control System.

      b.     The report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States and the State of such violation and its likely duration, in writing, within ten working Days of the Day Defendant first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report.  Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section IX (Force Majeure).

37.     Whenever any violation of this Consent Decree or of any applicable permits or any other event affecting Defendant's performance under this Consent Decree, or the performance of its Facility, may pose an emergency, as defined in Section III, Defendant shall notify EPA and the State orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event.  This procedure is in

addition to the requirements set forth in the preceding Paragraph. Failure to notify EPA and IDEM of a specific potential emergency event forfeits MLC's right to claim such event as an emergency under this Decree. In addition, EPA and IDEM retain the right to determine whether a specific event constitutes an "emergency."

38.    All reports shall be submitted to the persons designated in Section XIV (Notices).

39.    Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

40.    This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

41.    The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

42.    Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII.    STIPULATED PENALTIES

43.    Defendant shall be liable for stipulated penalties to the United States and the State for violations of this Consent Decree as specified below, unless excused under Section IX (Force

28

Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

44.    <u>Late Payment of Civil Penalty</u>.  If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a total stipulated penalty of $6,000 per Day for each Day that the payment is late.

45.    <u>Failure to Meet Compliance Milestones</u>.  For the following violations by Defendant:

| Violation | Stipulated Penalty | |
|---|---|---|
| Violation of paragraphs 13 (installation of CAS), 14 (tank modifications), 15 (removal of K tanks from use) | Period of Delay Or Noncompliance<br><br>Days 1-14<br>Days 15-30<br>Days 31 and later | Penalty per Day per violation<br><br>$1,000<br>$2,250<br>$4,000 |
| Violation of paragraph 16(e) and (f) (inspection, monitoring & temperature of tanks & separators); Violation of paragraph 17(d) (inspection & monitoring of closed vent system) | Period of Delay Or Noncompliance<br><br>Days 1-14<br>Days 15-30<br>Days 31 and later | Penalty per Day per violation<br><br>$500<br>$1,000<br>$1,750 |
| Violation of paragraph 18(a)-(b) (ECS performance specifications & requirements)) | $5,000 per testing event | |
| Violation of 18(f) (g), (h), (j) (carbon breakthrough concentration, replacement of canister, alarm) | Period of Delay Or Noncompliance<br><br>Days 1-14<br>Days 15-30<br>Days 31 and later | Penalty per Day per violation<br><br>$500<br>$1,000<br>$1,750 |
| Violation of paragraph 18(m) (spent carbon removal) | $1,000 per spent carbon canister or box | |
| Violation of paragraph 19 (performance testing requirements) | $5,000 per testing event | |

29

| Violation of paragraph 20 (installation requirements for FET2-FET4) | Period of Delay Or Noncompliance | Penalty per Day per violation |
|---|---|---|
| | Days 1-14 | $875 |
| | Days 15-30 | $1,870 |
| | Days 31 and later | $3,500 |
| Violation of paragraph 21(e)-(f) (operational failure of FET2-4 requirements or failure to monitor) | Period of Delay Or Noncompliance | Penalty per Day per violation |
| | Days 1-14 | $500 |
| | Days 15-30 | $1,000 |
| | Days 31 and later | $1,750 |
| Violation of paragraph 22 (CAS Monitoring) | Period of Delay Or Noncompliance | Penalty per Day per violation |
| | Days 1-14 | $500 |
| | Days 15-30 | $1,000 |
| | Days 31 and later | $1,750 |
| Violation of paragraph 23 (monitoring of tanks, oil-water separators, and Scrubber) | Period of Delay Or Noncompliance | Penalty per Day per violation |
| | Days 1-14 | $500 |
| | Days 15-30 | $1,000 |
| | Days 31 and later | $1,750 |
| Violation of paragraphs 24-26 (data logger and alarms, O&M Plan, application for FESOP for installation of CAS) | Period of Delay Or Noncompliance | Penalty per Day per violation |
| | Days 1-14 | $1,500 |
| | Days 15-30 | $2,100 |
| | Days 31 and later | $2,870 |

46.   Reporting Requirements.  The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section VII:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 900 | 1st through 14th day |
| $ 1,500 | 15th through 30th day |
| $ 2,229 | 31st day and beyond |

<u>Exceeding 25 tons per year under any circumstance</u>. If MLC's total facility HAP emissions exceed 25 tons per rolling 12-month period (recalculated monthly) at any time and for any reason, including due to emergencies, then MLC has violated this Decree and shall pay a stipulated penalty as follows: $5,000 for each ton that exceeds 25 tons per rolling 12-month period.

47.    Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

48.    Defendant shall pay stipulated penalties to the United States and the State within 30 Days of a written demand by either Plaintiff.  Defendant shall pay 50% percent of the total stipulated penalty amount due to the United States and 50% percent to the State.  The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiffs.

49.    Either Plaintiff may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

50.    Defendant may invoke the Dispute Resolution procedures by sending a Notice of Dispute no later than thirty (30) days after receiving a demand for stipulated penalties. Stipulated penalties shall continue to accrue as provided in Paragraph 48, but need not be paid until the following:

a.      If the dispute is resolved by agreement of the Parties or by a decision of EPA or the State that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States and/or the State within 30 Days of the effective date of the agreement or the receipt of EPA's and/or the State's decision or order.

b.      If the dispute is appealed to the Court and the United States or the State prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.      If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

51.      Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.  Defendant shall pay stipulated penalties owing to the State in the manner set forth and with the confirmation notices required by Paragraph 12 except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

52.      If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall

be construed to limit the United States or the State from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

53.    The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

54.    Non-Exclusivity of Remedy.  Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for Defendant's violation of this Decree or applicable law, including but not limited to an action against Defendant for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

IX.    FORCE MAJEURE

55.    "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

56.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to EPA and the State as specified in Section XIV (Notices), within 72 hours of when Defendant first knew that the event might cause a delay.  Within seven days thereafter, Defendant shall provide in writing to EPA and the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

57.     If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the

time for performance of any other obligation.  EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

58.     If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

59.     If Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so by serving a Notice of Dispute no later than 30 days after receipt of EPA's notice.  In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 55 and 56.  If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

X.     DISPUTE RESOLUTION

60.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

61.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be

35

considered to have arisen when Defendant sends the United States a written Notice of Dispute.

Such Notice of Dispute shall state clearly the matter in dispute. The period of informal

negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is

modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations,

then the position advanced by the United States shall be considered binding unless, within 30

Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute

resolution procedures as set forth below.

62.    <u>Formal Dispute Resolution</u>. Defendant shall invoke formal dispute resolution

procedures, within the time period provided in the preceding Paragraph, by serving on the United

States a written Statement of Position regarding the matter in dispute. The Statement of Position

shall include, but need not be limited to, any factual data, analysis, or opinion supporting

Defendant's position and any supporting documentation relied upon by Defendant.

63.    The United States shall serve its Statement of Position within 45 Days of receipt

of Defendant's Statement of Position. The United States' Statement of Position shall include,

but need not be limited to, any factual data, analysis, or opinion supporting that position and any

supporting documentation relied upon by the United States. The United States' Statement of

Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the

dispute in accordance with the following Paragraph.

64.    Defendant may seek judicial review of the dispute by filing with the Court and

serving on the United States, in accordance with Section XIV (Notices), a motion requesting

judicial resolution of the dispute. The motion must be filed within [30] Days of receipt of the

United States' Statement of Position pursuant to the preceding Paragraph. The motion shall

contain a written statement of Defendant's position on the matter in dispute, including any

supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

65.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

66.     Standard of Review

a.     <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 62 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.     <u>Other Disputes</u>.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 62, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree.

67.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but

payment shall be stayed pending resolution of the dispute as provided in Paragraph 47. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.    INFORMATION COLLECTION AND RETENTION

68.    The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Consent Decree;

b.    verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

c.    obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

d.    obtain documentary evidence, including photographs and similar data; and

e.    assess Defendant's compliance with this Consent Decree.

69.    Upon request, Defendant shall provide EPA and the State or their authorized representatives splits of any samples taken by Defendant.  Upon request, EPA and the State shall provide Defendant splits of any samples taken by EPA or the State.

70.    Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree.  This information-retention

38

requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States or the State, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

71.    At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States and the State at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, if made within 90 days of such notice, Defendant shall deliver any such documents, records, or other information to EPA or the State.  Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendant asserts such a privilege, it shall provide the following:  (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

72.    Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

73.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

74.    This Consent Decree resolves the civil claims of the United States and the State for the violations alleged in the Complaint filed in this action through the date of lodging.

75.    The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions.  The United States and the State further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Defendant's Facility.

76.     In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, other appropriate relief relating to the Facility or Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 74.

40

77.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, 42 U.S.C. § 7401, et seq., or with any other provisions of federal, State, or local laws, regulations, or permits.

78.     This Consent Decree does not limit or affect the rights of Defendant or of the United States or the State against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

79.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

XIII.   COSTS

80.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the State shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XIV.   NOTICES

81.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

|  |  |
|---|---|
| As to the United States by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ #90-5-2-1-11985 |
| As to the United States by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C.  20044-7611<br>Re: DJ # 90-5-2-1-11985 |
| As to EPA by email: | R5airenforcement@epa.gov<br><br>With a copy to:<br>Linda Rosen<br>rosen.linda@epa.gov |
| As to EPA by mail: | Attn: Compliance Tracker, ECA-18J<br>Air Enforcement and Compliance Assurance |

42

|  | Branch<br>U.S. Environmental Protection Agency Region 5<br>77 W. Jackson Boulevard<br>Chicago, Illinois 60604 |
|---|---|
| As to the State by mail and email: | Indiana Department of Environmental Management<br>Chief, Air Compliance and Enforcement Branch<br>Phil Perry pperry@idem.in.gov<br>100 North Senate Avenue<br>MC-61-53, IGCN 1003<br>Indianapolis, Indiana 46204-2251 |
| As to Defendant by email: | Adam Bujoll<br>ABujoll@metalworkinglubricants.com<br><br>With a copy to:<br>Colin Connor<br>cconnor@psrb.com |
| As to Defendant by mail: | Adam Bujoll<br>Metalworking Lubricants Company<br>25 W. Silverdome Industrial Park<br>Pontiac, MI 48342<br><br>With a copy to:<br>Colin Connor<br>Plews Shadley Racher & Braun LLP<br>1346 N. Delaware Street<br>Indianapolis, IN 46202 |

82.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

83.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.    EFFECTIVE DATE

84.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted,

whichever occurs first, as recorded on the Court's docket.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XVI.   RETENTION OF JURISDICTION

85.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X and XVII, or effectuating or enforcing compliance with the terms of this Decree.

## XVII.   MODIFICATION

86.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

87.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section X (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 66, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

88.    After Defendant has completed the requirements of Section V (Compliance Requirements), has thereafter maintained  satisfactory compliance with this Consent Decree and Defendant's permit for a period of five years, has complied with all other requirements of this Consent Decree and has paid the civil penalty and any accrued stipulated penalties as required by

44

this Consent Decree, Defendant may serve upon the United States and the State a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

89.    Following receipt by the United States and the State of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States after consultation with the State agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

90.    If the United States after consultation with the State does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section X. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until after service of its Request for Termination.

## XIX.    PUBLIC PARTICIPATION

91.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XX.    SIGNATORIES/SERVICE

92.    Each undersigned representative of Defendant and other parties to the Decree and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

93.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXI.   INTEGRATION

94.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXII.  FINAL JUDGMENT

95.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, and Defendant.

## XXIII. 26 U.S.C. SECTION 162(F)(2)(A)(ii) IDENTIFICATION

96.     For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 4; Section V (Compliance Requirements), Paragraphs 13-32 and related Appendices; Section VII (Reporting Requirements), Paragraphs 36 and 38-39; and Section XI (Information Collection and Retention), Paragraphs 68-71 is restitution or required to come into compliance with law.

## XXIV. APPENDICES

97.     The following Appendices are attached to and part of this Consent Decree:

"Appendix 1 is a diagram of the existing tanks, oil-water separators, piping, ductwork, and closed-vent system to the Emission Control System;

"Appendix 2" is a description of the procedures for the inspection and monitoring of the tanks and separators listed in Paragraphs 14 and 20 of this Decree;

"Appendix 3" is a description of the requirements for the inspection and monitoring of the closed-vent system set forth in Paragraph 17 of this Decree;

"Appendix 4" are the required emission test methods and procedures as set forth in Paragraphs 18 and 19 of this Decree; and

"Appendix 5" are the required monitoring methods and procedures as set forth in Paragraphs 22 and 23 of this Decree.

"Appendix 6" are the manufacturer's specifications for the CAS referred to in Paragraph 13 of this Decree.

"Appendix 7" is the Malfunction Abatement Plan referred to in Paragraph 18 of this Decree.

Dated and entered .

Date: 9/20/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: _____

Deputy Clerk, U.S. District Court

Distribution via ECF

48

Signature Page for the Consent Decree in *United States and State of Indiana v. Metalworking Lubricants Company* (S.D. Ind.):

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

August 3, 2022
Date

RICHARD GLADSTEIN, Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611

49

Signature Page for the Consent Decree in *United States and State of Indiana v. Metalworking Lubricants Company* (S.D. Ind.):

**FOR THE STATE OF INDIANA:**

Date:

BRIAN C. ROCKENSUESS
Commissioner
Indiana Department of Environmental
Management 100 North Senate Avenue
Indianapolis, IN 46204

Date:

VALERIE TACHTIRIS
KYLE BURNS
Office of Legal Counsel
Indiana Department of Environmental
Management 100 North Senate Avenue
Indianapolis, IN 46204

Date:

PATRICIA ORLOFF ERDMANN
Chief Counsel of Litigation
ALEKSANDRINA PRATT
Office of the Indiana Attorney
General Indiana Government
Center South 5th Floor
302 West Washington
Street Indianapolis, IN
46204

Signature Page for the Consent Decree in *United States and State of Indiana v. Metalworking Lubricants Company* (S.D. Ind.):

### FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

ROBERT KAPLAN

Digitally signed by ROBERT KAPLAN
Date: 2022.07.28 22:33:43 -05'00'

Date:

ROBERT A. KAPLAN
Regional Counsel
U.S. Environmental Protection Agency
Region 5 (C-14J)
77 West Jackson Boulevard
Chicago, IL 60604

*Robert M. Peachey*

Digitally signed by ROBERT PEACHEY
Date: 2022.07.27 10:05:18 -05'00'

ROBERT M. PEACHEY
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
Office of Regional Counsel

Signature Page for the Consent Decree in *United States and State of Indiana v. Metalworking Lubricants Company* (S.D. Ind.):

**FOR DEFENDANT:**

_____
Date

_____
KIM ONNIE
METALWORKING LUBRICANTS COMPANY

Appendix 1- Site Diagram









SECONDARY CONTAINMENT CAPACITIES

POLY LINED FENCE PLUS SUMP    9,650 GALLONS
EAST TANK FARM    39,573 GALLONS
PROCESS TANK FARM    152,699 GALLONS
BLENDING TANK FARM    144,000 GALLONS

NOTE: The White River, located approximately 2,000 feet west of the facility, is receiving storm water via two manholes.

BASE MAP LEGEND

TANK

TANK TO BE REMOVED

TANK TO BE ADDED TO SCRUBBER SYSTEM

P-13    PERMANENTLY DECOMMISSIONED 2018

BREAK AREA

BLEACH

VTA

PROPOSED CAS

SCRUBBER

PROCESS TANK FARM

PUMP HOUSE

EAST TANK FARM

CTR RM

SUMP

WATER TREATMENT BUILDING

DRUM AND TOTE STORAGE

B24  B23  B22  B21  B20  B19  B18
B31  B30  B29
B46  B32  B50
B33  B52
B48  B51

D1  H1  P22  P23  P24  K-3  K-1
D2  H2  D4  P2  S5  K-2
D3  H3  D5  P7  P20  P21  S3

S42
S11  S9  P18  P19
S14  P16
S13  S10  P17  P13 "OOS"

03  04  S16
C2  A4
C3  02  01

FET2  FET3  FET4  W2  W3
SHT2  W4  W5  W6  W7  W8

| DATE | REVISIONS / NOTES |
|---|---|
| 4/06/22 | REVISED PER IDEM & EPA |
| 6/09/21 | WATER TREATMENT BLDG |
| 3/12/21 | UPDATE "S" TANKS TO "ST" |
| SCALE | 20' |

Metalworking Lubricants Company
1509 S. Senate Avenue
Indianapolis, IN 46225
Process Tank Farm Detail

ACS Engineering
1400 Broadfield Blvd, Suite 130
Houston, Texas 77084
281-945-1922

Appendix 1 - Major Working Tank List

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| M1 | 1992 | 1,200 | No | Blending Bldg | Oil | Product Blending Tank - Vented Indoor | Tank in use. | None |
| M2 | 2013 | 6,500 | No | Blending Bldg | Oil | Product Blending Tank - Vented Indoor | Tank in use. | None |
| M3 | 1992 | 6,000 | No | Blending Bldg | Oil | Product Blending Tank - Vented Indoor | Tank in use. | None |
| M4 | 1992 | 7,000 | No | Blending Bldg | Oil | Product Blending Tank - Vented Indoor | Tank in use. | None |
| M5 | 1992 | 7,000 | No | Blending Bldg | Oil | Product Blending Tank - Vented Indoor | Tank in use. | None |
| B01 | PRE-1993 | 19,086 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B02 | PRE-1993 | 19,086 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B03 | PRE-1993 | 19,086 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B04 | PRE-1993 | 30,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B05 | PRE-1993 | 18,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B06 | PRE-1993 | 18,439 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B07 | PRE-1993 | 19,733 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B08 | PRE-1993 | 19,733 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B09 | PRE-1993 | 19,086 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B10 | PRE-1993 | 15,500 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B11 | PRE-1993 | 4,696 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B12 | PRE-1993 | 4,696 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | B12 in not in use but tank is still installed. | None |
| B13 | PRE-1993 | 4,696 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B14 | PRE-1993 | 12,000 | | Blending Tank Farm (BTF) | Hydrotreated Heavy Paraffin Distillate | Product Storage Tank | Tank in use. | None |
| B15 | PRE-1993 | 19,410 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |

Appendix 1 - Major Working Tank List

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| B16 | PRE-1993 | 15,528 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B17 | PRE-1993 | 18,439 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B18 | PRE-1993 | 18,439 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B19 | PRE-1993 | 18,439 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B20 | PRE-1993 | 11,322 | No | Blending Tank Farm (BTF) | Mineral Seal Oil | Product Storage Tank | Tank in use. | None |
| B21 | PRE-1993 | 6,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B22 | PRE-1993 | 5,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B23 | PRE-1993 | 5,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B24 | PRE-1993 | 10,500 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B25 | PRE-1993 | 18,500 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B26 | PRE-1993 | 18,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B27 | PRE-1993 | 19,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B28 | PRE-1993 | 20,000 | No | Blending Tank Farm (BTF) | Mineral Seal Oil | Product Storage Tank | Tank in use. | None |
| B29 | PRE-1993 | 8,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B30 | PRE-1993 | 9,000 | No | Blending Tank Farm (BTF) | Solvent-Refined Heavy Paraffinic Distillate | Product Storage Tank | Tank in use. | None |
| B31 | PRE-1993 | 10,500 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B32 | PRE-1993 | 10,850 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B33 | PRE-1993 | 18,480 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B34 | PRE-1993 | 25,880 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B35 | PRE-1993 | 29,610 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |

Appendix 1 - Manufacturing Tank List

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| B36 | PRE-1993 | 29,610 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B37 | PRE-1993 | 25,880 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B38 | PRE-1993 | 29,610 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B39 | PRE-1993 | 29,610 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B40 | PRE-1993 | 6,642 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B41 | PRE-1993 | 8,297 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B42 | PRE-1993 | 7,572 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B43 | PRE-1993 | 6,642 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B44 | PRE-1993 | 19,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B45 | PRE-1993 | 4,696 | No | Blending Tank Farm (BTF) | Demulsifer Base | Product Storage Tank | Tank in use. | None |
| B46 | PRE-1993 | 21,353 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B47 | 1996 | 21,353 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B48 | 1996 | 21,353 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B49 | PRE-1993 | 20,269 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B50 | PRE-1993 | 11,983 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B51 | PRE-1993 | 20,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B52 | PRE-1993 | 27,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B53 | 1993 | 2,000 | No | Blending Tank Farm (BTF) | Acetic Acid | Product Storage Tank | Tank in use. | None |
| B54 | 1993 | 2,000 | No | Blending Tank Farm (BTF) | Metbreak 6500 | Product Storage Tank | Tank in use. | None |
| B55 | 1993 | 2,000 | No | Blending Tank Farm (BTF) | Oil | Product Storage Tank | Tank in use. | None |
| B99 | PRE-1993 | 19,400 | No | Blending Tank Farm (BTF) | Diesel Fuel (Low Sulfur) | Diesel Fuel Storage for Trucks | Tank in use. | None |

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| A4 | 1997 | 12,000 | No | East Tank Farm (ETF) | Sulfuric Acid (Beneficial Reuse Acid) | Reuse Acid Storage | Tank in use. | None |
| C2 | 1992 | 12,000 | No | East Tank Farm (ETF) | Sodium Hydroxide (Caustic) | Chemical Storage Tank | Tank in use. | None |
| C3 | 1992 | 12,000 | No | East Tank Farm (ETF) | Sodium Hydroxide (Caustic) | Chemical Storage Tank | Tank in use. | None |
| O1 | 1996 | 16,000 | No | East Tank Farm (ETF) | Chemical / Oil | Storage Tank | Tank in use. | None |
| O2 | 1996 | 16,000 | No | East Tank Farm (ETF) | Chemical / Oil | Storage Tank | Tank in use. | None |
| O3 | 1996 | 20,000 | No | East Tank Farm (ETF) | Chemical / Oil | Storage Tank | Tank in use. | None |
| O4 | 1996 | 20,000 | No | East Tank Farm (ETF) | Chemical / Oil | Storage Tank | Tank in use. | None |
| BLEACH TANK | Approx. 2001 | 6,500 | No | NW corner of Processing Tank Farm - outside of containment | Sodium Hypochlorite (Bleach) | Bleach storage for scrubber | Tank in use. | None |
| D1 | 2018 | 11,000 | Yes | Process Tank Farm (PTF) | Oil | Heated Product Tanks | Tank in use. | None |
| D2 | 2018 | 11,000 | Yes | Process Tank Farm (PTF) | Oil | Heated Product Tanks | Tank in use. | None |
| D3 | 1996 | 16,289 | Yes | Process Tank Farm (PTF) | Oil | Heated Product Tanks | Tank in use. | None |
| D4 | 1996 | 16,350 | Yes | Process Tank Farm (PTF) | Oil | Heated Product Tanks | Tank in use. | None |
| D5 | 2001 | 16,350 | Yes | Process Tank Farm (PTF) | Oil | Heated Product Tanks | Will be removed as part of the Vacuum Implementation Plan. | Tank will be removed |
| FET2 | 1996 | 18,784 | No | Process Tank Farm (PTF) | Wastewater | Wastewater Settling Tank prior to POTW (Wastewater Treatment Plant) | Tank in use. | Fixed roof requirements |
| FET3 | 1996 | 19,410 | No | Process Tank Farm (PTF) | Wastewater | Wastewater Settling Tank prior to POTW (Wastewater Treatment Plant) | Tank in use. | Fixed roof requirements |
| FET4 | 1996 | 17,469 | No | Process Tank Farm (PTF) | Wastewater | Wastewater Settling Tank prior to POTW (Wastewater Treatment Plant) | Tank in use. | Fixed roof requirements |
| H1 | 1993 | 20,000 | No | Process Tank Farm (PTF) | Oil | Product holding tank | Tank in use. | None |
| H2 | 1993 | 20,000 | No | Process Tank Farm (PTF) | Oil | Product holding tank | Tank in use. | None |
| H3 | 1993 | 20,000 | No | Process Tank Farm (PTF) | Oil | Product holding tank | Tank in use. | None |

Appendix 1 - Major Working Tank List

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| K1 | 2012 | 14,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | K tanks will be removed based on Vacuum Implementation Plan | Tank will be removed |
| K2 | 2012 | 15,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | K tanks will be removed based on Vacuum Implementation Plan | Tank will be removed |
| K3 | 2011 | 17,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | K tanks will be removed based on Vacuum Implementation Plan | Tank will be removed |
| P13 | 1996 | 30,811 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | Permanently Decommissioned in 2018 but tank remains onsite | None |
| P16 | 2015 | 20,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| P17 | 2015 | 20,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| P18 | 2015 | 20,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| P19 | 2015 | 20,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| P2 | 2015 | 20,000 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | Will be removed as part of the Vacuum Implementation Plan. | Tank will be removed |
| P-20 | 2018 | 18,600 | Yes | Process Tank Farm (PTF) | oil | Oil Processing Tank | Will be removed as part of the Vacuum Implementation Plan. | Tank will be removed |
| P-21 | 2018 | 18,600 | Yes | Process Tank Farm (PTF) | oil | Oil Processing Tank | Will be removed as part of the Vacuum Implementation Plan. | Tank will be removed |
| P-22 | 2018 | 18,600 | Yes | Process Tank Farm (PTF) | oil | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| P-23 | 2018 | 18,600 | Yes | Process Tank Farm (PTF) | oil | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| P7 | 2010 | 21,800 | Yes | Process Tank Farm (PTF) | Oil | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |

Appendix 1 - Major Working Tank List

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| S10 | 1996 | 30,310 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| S11 | 1996 | 20,000 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| S13 | 1996 | 10,368 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| S14 | 1996 | 15,557 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| S16 | 2015 | 6,000 | No | East Tank Farm (ETF) | Poly | Chemical Storage Tank | Tank in use. | None |
| S3 | 1996 | 20,000 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| S42 | 1996 | 42,000 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| S5 | 1996 | 23,000 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| S9 | 1996 | 25,907 | No | Process Tank Farm (PTF) | Chemical, Oil, or Waste Water | Storage Tank | Tank in use. | None |
| SHT2 | 1991 | 25,380 | Yes | Process Tank Farm (PTF) | oil or waste water | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| W2 | 1996 | 18,763 | No | Process Tank Farm (PTF) | Oil / Wastewater | Waste Water Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| W3 | 1996 | 19,170 | No | Process Tank Farm (PTF) | Oil / Wastewater | Waste Water Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| W4 | 1996 | 25,380 | No | Process Tank Farm (PTF) | Oil / Wastewater | Waste Water Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| W5 | 1996 | 25,380 | No | Process Tank Farm (PTF) | Oil / Wastewater | Waste Water Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| W6 | 1996 | 25,380 | Yes | Process Tank Farm (PTF) | Oil / Wastewater | Oil Processing and Waste Water Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| W7 | 1996 | 25,380 | No | Process Tank Farm (PTF) | Oil / Wastewater | Waste Water Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |
| W8 | 1996 | 22,306 | Yes | Process Tank Farm (PTF) | Oil / Wastewater | Oil Processing Tank | Tank in use. | Fixed roof requirements and closed vent system to Emission Control System (scrubber and CAS) |

Appendix 1 - Master Working Tank List

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| FRAC1 | 2000 | 20,000 | No | Truck Unloading Pad | Oil / Wastewater | Truck Unloading / storage | Tank in use. | None |
| FRAC2 | 2015 | 20,000 | No | Truck Unloading Pad | Oil / Wastewater | Truck Unloading / storage | Tank in use. | None |
| ALUM1 | 2001 | 4,000 | No | Water Treatment Building | Aluminum Chlorohydrate | Additive storage tank - vented indoor | Tank in use. | None |
| ALUM2 | 2001 | 6,500 | No | Water Treatment Building | Aluminum Chlorohydrate | Additive storage tank - vented indoor | Tank in use. | None |
| CAUSTIC | 1996 | 6,000 | No | Water Treatment Building | Sodium Hydroxide (Caustic) | Chemical Storage Tank | Tank in use. | None |
| DAF | 2006 | 2,880 | No | Water Treatment Building | waste water | Dissolved Air Flotation (DAF) Unit (Wastewater Treatment Plant) | Tank in use. | None |
| DAF MIXER 1 | 2020 | 1100 | NO | Water Treatment Building | waste water | Dissolved Air Flotation (DAF) Unit (Wastewater Treatment Plant) | Tank in use. | None |
| DAF Mixer 2 | 2005 | 1,100 | No | Water Treatment Building | waste water | Dissolved Air Flotation (DAF) Mix Tank (Wastewater Treatment Plant) | Tank in use. | None |
| Equalization Tank (Big Pit) | Pre-1993 | 60,000 | No | Water Treatment Building | wastewater | Waste water equalization tank - Wastewater Treatment Plant | Tank in use. | Tank will only be used for storage. Heat capabilities will be removed. |
| FET1 | 2003 | 15,557 | No | Water Treatment Building | Sludge | Sludge from Clarifier (Wastewater Treatment Plant) | Tank in use. | None |
| POLYMER | 2001 | 7,500 | No | Water Treatment Building | Polymer (Hyperfloc AE 853G) | Polymer storage tank (Wastewater Treatment Plant) | Tank in use. | None |
| SHT1 | 2000 | 12,100 | No | Water Treatment Building | Solids | Solids storage prior to shipping off-site for disposal (Wastewater Treatment Plant) | Tank in use. | None |
| SMALL PIT | 1993 | 6,500 | No | Water Treatment Building | waste water | Wastewater storage | Tank in use. | None |
| A1 | 2017 | 6,500 | No | Water Treatment Building | Acid | Chemical Storage Tank | Tank in use. | None |

| TANK # | Year Installed | Maximum Capacity (gals) | Currently Controlled by Scrubber | Location | Contents | Tank Use | Status | Modifications based on Consent Decree |
|---|---|---|---|---|---|---|---|---|
| A2 | 2021 | 5,500 | No | Water Treatment Building | Acid | Chemical Storage Tank | Tank in use. | None |
| CATFLOC | 2001 | 7,500 | No | Water Treatment Building | CAT 4635 | Chemical Storage Tank | Tank in use. | None |
| L1 | Not installed yet | 30,000 | No | Not installed yet | Chemical, Oil, or Waste Water | Storage Tank | Not installed yet. IDEM Permit approved to install tank. | None |
| L2 | Not installed yet | 30,000 | No | Not installed yet | Chemical, Oil, or Waste Water | Storage Tank | Not installed yet. IDEM Permit approved to install tank. | None |

Appendix 2:  Inspection Procedures for Tanks and Oil-Water Separators

The following inspection requirements apply to MLC's tanks and oil-water separators listed in paragraphs 14 and 20 of this Consent Decree.

1. The fixed roof and its closure devices shall be visually inspected to check for defects that could result in air emissions. Defects include, but are not limited to, visible cracks, holes, or gaps in the roof sections or between the roof and the separator wall; broken, cracked, or otherwise damaged seals or gaskets on closure devices; and broken or missing hatches, access covers, caps, or other closure devices. If a tank or oil-water separator is buried partially or entirely underground, inspection is required only for those portions of the cover that extend to or above the ground surface, and those connections that are on such portions of the cover (e.g., fill ports, access hatches, gauge wells, etc.) and can be opened to the atmosphere.

2. By no later than July 31, 2023, MLC must perform an initial inspection of all tanks and oil-water separators listed in paragraphs 14 and 20 of this Decree. Upon installation of any new or replacement tanks or oil-water separators, MLC must perform an initial inspection within 30 days of installation.  Thereafter, MLC must perform the inspections at least once every quarter.

   A. In the event that a defect is detected, MLC shall, within 45 calendar days of detecting the defect, either repair the defect or empty the tank or oil-water separator and remove it from service.  If within this 45-day period the defect cannot be repaired, or the tank or oil-water separator cannot be removed from service, without disrupting operations at the plant site, MLC is allowed one 30-day extension. If MLC elects to use a 30-day extension, MLC shall prepare and maintain documentation describing the defect, explaining why alternative storage capacity is not available, and specify a schedule of actions that will ensure that the defect detected will be repaired or the tank or oil-water separator emptied as soon as possible. When a defect is detected during an inspection of a tank or oil-water separator that has been emptied and degassed, MLC shall repair the defect before refilling the tank or oil-water separator.

   B. MLC shall maintain the following records for all inspections and their corrective actions:

      i. A record for each inspection that includes the tank identification number (or other unique identification description as selected by MLC) and the date of inspection;

      ii. A record of each defect detected during the inspection including: the location of the defect, a description of the defect, the date of detection, and corrective action taken to repair the defect. If repair of the defect is delayed in accordance with paragraph 2.A of this appendix, above, MLC shall also record the reason for the delay and the date that repair of the defect is expected and completed.

Appendix 3:  Inspection Requirements for Closed-Vent System

1. If MLC's closed-vent system is complying by means of no detectable organic emissions, then MLC shall inspect and monitor the closed-vent system in accordance with the following requirements:

A. By no later than July 31, 2023, MLC shall monitor the closed-vent system components and connections using the following procedures to demonstrate that the closed-vent system operates with no detectable organic emissions.

i. The test shall be conducted in accordance with the procedures specified in Method 21 of 40 C.F.R. Part 60, Appendix A ("Method 21"). Each potential leak interface (i.e., a location where organic vapor leakage could occur) on the cover and associated closure devices shall be checked. Potential leak interfaces that are associated with covers and closure devices include, but are not limited to: the interface of the cover and its foundation mounting; the periphery of any opening on the cover and its associated closure device; and the sealing seat interface on a spring-loaded pressure-relief valve.

ii. The test shall be performed when the unit contains a material having a total organic concentration representative of the range of concentrations for the materials expected to be managed in the unit. During the test, the cover and closure devices shall be secured in the closed position.

iii. The detection instrument shall meet the performance criteria of Method 21 of 40 C.F.R. part 60, appendix A, except the instrument response factor criteria in section 8.1.1 of Method 21 shall be for the weighted average composition of the organic constituents in the material placed in the unit at the time of monitoring, not for each individual organic constituent.

iv. The detection instrument shall be calibrated before use on each day of its use by the procedures specified in Method 21 of 40 C.F.R. Part 60, Appendix A.

v. Calibration gases shall be as follows:

(i) Zero air (less than 10 ppmv hydrocarbon in air); and

(ii) A mixture of methane or n-hexane in air at a concentration of approximately, but less than, 500 ppmv.

vi. MLC may choose to adjust or not adjust the detection instrument readings to account for the background organic concentration level. If MLC chooses to adjust the instrument readings for the background level, the background level value must be determined according to the procedures in Method 21 of 40 C.F.R. Part 60, Appendix A.

vii. Each potential leak interface shall be checked by traversing the instrument probe around the potential leak interface as close to the interface as possible, as described in Method 21. If the configuration of the cover or closure device prevents a complete traverse of the interface, all accessible portions of the interface shall be sampled. If the configuration of the closure device prevents

54

any sampling at the interface, and the device is equipped with an enclosed extension or horn (e.g., some pressure relief devices), the instrument probe inlet shall be placed at approximately the center of the exhaust area to the atmosphere.

viii. MLC must determine if a potential leak interface operates with no detectable emissions as follows:

    a. If MLC chooses not to adjust the detection instrument readings for the background organic concentration level, then the maximum organic concentration value measured by the detection instrument is compared directly to the applicable value for the potential leak interface as specified in paragraph 1.A.(viii)c, below.

    b. If MLC chooses to adjust the detection instrument readings for the background organic concentration level, the value of the arithmetic difference between the maximum organic concentration value measured by the instrument and the background organic concentration value is compared with the applicable value for the potential leak interface as specified in paragraph 1.A.(viii)c, below.

    c. The potential leak interface is determined to operate with no detectable organic emissions if the organic concentration value determined is less than 500 ppmv.

ix. In the event that detectable emissions or a defect in the closed-vent system are detected, MLC shall repair the defect or leak as follows:

    a. MLC shall make first efforts at repair of the defect or leak no later than 5 calendar days after detection, and repair shall be completed as soon as possible but no later than 15 calendar days after detection.

    b. Repair of a defect may be delayed beyond 15 calendar days if completion of the repair is technically infeasible without the shutdown of the process or unit that vents to the closed-vent system, or MLC determines that the air emissions resulting from the repair of the defect within the specified period would be greater than the fugitive emissions likely to result by delaying the repair until the next time the process or unit that vents to the closed-vent system is shutdown. In this case, MLC must repair the defect the next time the process or unit that vents to the closed-vent system is shutdown. Repair of the defect must be completed before the process or unit resumes operation.

B. After the initial inspection, MLC shall monitor the closed-vent system at least once per quarter, as follows:

i. Closed-vent system joints, seams, or other connections that are permanently or semi-permanently sealed (e.g., a welded joint between two sections of hard piping or a bolted and gasketed ducting flange) shall be visually inspected to check for defects that could result in air emissions. MLC shall monitor a component or

55

connection using the procedures specified in paragraph 1.A.(viii)., above to demonstrate that it operates with no detectable organic emissions, any time after the component is repaired or replaced (e.g., a section of damaged hard piping is replaced with new hard piping) or the connection is unsealed (e.g., a flange is unbolted).

    ii. Closed-vent system components or connections other than those specified in paragraph 1.B.(i), above, shall be monitored at least once per quarter using the procedures specified in paragraph 1.A.(viii). to demonstrate that components or connections operate with no detectable organic emissions.

    iii. In the event that a defect or leak is detected, MLC shall repair the defect or leak as follows:

        a. MLC shall make first efforts at repair of the leak or defect no later than 5 calendar days after detection, and repair shall be completed as soon as possible but no later than 15 calendar days after detection.

        b. Repair of a defect may be delayed beyond 15 calendar days if completion of the repair is technically infeasible without the shutdown of the process or unit that vents to the closed-vent system or MLC determines that the air emissions resulting from the repair of the defect within the specified period would be greater than the fugitive emissions likely to result by delaying the repair until the next time the process or unit that vents to the closed-vent system is shutdown. In this case, MLC must repair the defect the next time the process or unit that vents to the closed-vent system is shutdown. Repair of the defect must be completed before the process or unit resumes operation.

C. MLC shall maintain the following records for the closed-vent inspection and defect repair:

    i. A record for each inspection that includes equipment identification numbers and the dates of inspection;

    ii. A record of each incident of detectable emissions or defect detected during the inspection including: the location of the detectable emissions or defect, a description of the detectable emissions or defect, the date of detection, and corrective action taken to repair the detectable emissions or defect. If repair of the detectable emissions or defect is delayed in accordance with the paragraphs 1.A(ix)(b) or 1.B(iii)(b), above, MLC shall also record the reason for the delay and the date that completion of repair of the leak or defect is expected.

2. If MLC's closed-vent system is complying by means of being designed and operating at a pressure below atmospheric pressure, MLC shall inspect and monitor the system in accordance with the following requirements:

A. MLC shall visually inspect the closed-vent system to check for defects that could result in air emissions. Defects include, but are not limited to, visible cracks, holes, or

gaps in ductwork or piping; loose connections; or broken or missing caps or other closure devices.

B. MLC shall perform an initial inspection within 30 days after the initial operation of the closed-vent system. Thereafter, MLC must perform the inspections at least once every quarter.

C. MLC shall repair all detected defects as follows:

    i. MLC shall make first efforts at repair of the defect no later than 5 calendar days after detection and repair shall be completed as soon as possible but no later than 15 calendar days after detection.

    ii. Repair of a defect may be delayed beyond 15 calendar days if completion of the repair is technically infeasible without the shutdown of the process or unit that vents to the closed-vent or MLC determines that the air emissions resulting from the repair of the defect within the specified period would be greater than the fugitive emissions likely to result by delaying the repair until the next time the process or unit that vents to the closed-vent system is shutdown. In this case, MLC must repair the defect the next time the process or unit that vents to the closed-vent system is shutdown. Repair of the defect must be completed before the process or unit resumes operation.

F. MLC shall maintain the following records for all closed-vent inspections and defect repairs:

    i. A record for each inspection that includes equipment identification numbers and the dates of inspection;

    ii. A record of each defect detected during the inspection including: the location of the defect, a description of the defect, the date of detection, and corrective action taken to repair the defect. If repair of the defect is delayed in accordance with the provisions of this appendix, MLC shall also record the reason for the delay and the date that completion of repair of the defect is expected.

Appendix 4: Test Methods and Procedures

1. Performance tests shall be based on representative performance (i.e., performance based on normal operating conditions) and shall exclude periods of startup, shutdown or malfunction. MLC shall record the process and Emission Control System information that is necessary to document operating conditions during the test and include in its operating record and the test report required by paragraph 4., below, an explanation to support that such conditions represent normal operation.

2. No later than 60 days prior to any performance test required by this Decree, MLC shall submit to the EPA and to IDEM a performance test protocol for review. The protocol

shall outline the test methods and procedures to be used during testing and the proposed operating conditions for the test.  EPA and IDEM reserve the right to require changes to the protocol before the performance test begins. MLC shall conduct testing under a protocol approved in advance by EPA and IDEM.

3.    No later than 21 days prior to any performance test required by this Decree, MLC shall submit to the EPA and to IDEM a notification of intent to test. The intent to test must identify the dates, times, methods to be used, and other relevant information related to the emissions testing required by this appendix.

4.    Within 60 days of completing the performance test, MLC will submit to EPA and IDEM a performance test report pursuant to Section 114(a)(1) of the CAA, 42 U.S.C. § 7414(a)(1). The report must include at minimum: emission results for TOC and $SO_2$ expressed in the units of the standard (percent removal for TOC and lb/hour for $SO_2$); process and Emission Control System operating parameters recorded during the test; all calculations and supporting data; and a discussion of errors or problems encountered, both real and apparent.

5.    The TOC removal efficiency of the Emission Control System shall be determined by simultaneously measuring the inlet and outlet gas phase TOC concentrations and gas volumetric flow rates in accordance with test methods and procedures outlined in this appendix. A minimum of three sample runs must be performed. The minimum sampling time for each run shall be 1 hour. For Method 18, either an integrated sample or a minimum of four grab samples shall be taken.  If grab sampling is used, then the samples shall be taken at approximately equal intervals in time such as 15 minute intervals during the run.

6.    The $SO_2$ mass emission rate shall be determined by measuring the outlet gas phase $SO_2$ concentrations and gas volumetric flow rates in accordance with the test methods and procedures outlined in this appendix. A minimum of three sample runs must be performed. The minimum sampling time for each run shall be 1 hour.

7.    The following test methods and procedures shall be used:

A.    Method 1 or 1A of 40 C.F.R. Part 60, Appendix A, as appropriate shall be used for selection of the sampling sites at the inlet and outlet of the Emission Control System, as follows:

   a.    To determine compliance with the TOC Emission Control System percent reduction requirement, sampling sites shall be located at the inlet of the Emission Control System and at the outlet of the Emission Control System; and

   b.    To determine compliance with the $SO_2$ Emission Control System mass limit, the sampling site shall be located at the outlet of the Emission Control System.

B.    The gas volumetric flow rate shall be determined using Method 2, 2A, 2C, or 2D, 2F, or 2G of 40 CFR part 60, appendix A, as appropriate.

C.    Method 3 or 3A, of 40 C.F.R. Part 60, Appendix A, as appropriate, shall be used for gas analysis.

D.    Method 4 of 40 C.F.R. Part 60, Appendix A, as appropriate, shall be used to determine the moisture content of the stack gas.

E.    Methods 2, 2A, 2C, 2D, 2F, 2G, 3, 3A and 4, as applicable, must be performed at least twice during each run.

F.    Method 6 or 6C, as appropriate, of Appendix A of 40 C.F.R. Part 60 shall be used to determine the $SO_2$ lb/hour emissions.

G.    Method 25A of 40 CFR part 60, appendix A shall be used to measure TOC. Method 18 may be used to measure methane and ethane, and the measured concentration may be subtracted from the Method 25A measurement.

H.    The following equations (or equivalent) shall be used to calculate $SO_2$ and TOC emissions in terms of mass:

$$Ei=K2\times Qi\times Ci\times Mi$$

$$Eo=K2\times Qo\times Co\times Mo$$

Where:

Ci, Co (for TOC) = the average concentration reading (minus methane and ethane) measured by Method 25A of 40 C.F.R. Part 60, Appendix A at the inlet and outlet of the control device, respectively, dry basis, parts per million by volume;

59

Co (for $SO_2$) = the average concentration reading measured by Method 6 or 6C of 40 C.F.R. Part 60, Appendix A at the outlet of the control device, dry basis, parts per million by volume;

Ei, Eo (for TOC) = Mass rate of TOC (minus methane and ethane) at the inlet and outlet, respectively, dry basis, kilogram per hour;

Eo (for $SO_2$) = Mass rate of $SO_2$ at the outlet, dry basis, kilograms per hour;

Mi, Mo (TOC) = Average molecular weight of the TOC at the inlet and outlet of the control device, respectively, gram/gram-mole;

Mo ($SO_2$) = Molecular weight of $SO_2$ gram/gram-mole;

Qi, Qo = Flow rate of gas stream at the inlet and outlet of the control device, respectively, dry standard cubic meter per minute; and

K2 = Constant, $2.494 \times 10^{-6}$ (parts per million) $^{-1}$ (gram-mole per standard cubic meter) (kilogram/gram) (minute/hour), where standard temperature (gram-mole per standard cubic meter) is 20 °C.

The percent reduction in TOC (minus methane and ethane) shall be calculated as follows:

$$CE = (Ei - Eo)/Ei \times 100$$

where:

CE = Control efficiency of control device, percent;

Ei = Mass rate of TOC (minus methane and ethane) at the inlet to the control device, kilograms TOC per hour; and

Eo = Mass rate of TOC (minus methane and ethane) at the outlet of the control device, kilograms TOC per hour per hour.

Appendix 5:  Monitoring Methods and Procedures

General

1. MLC shall install and operate a fixed detector to continuously measure organic concentration in the exhaust stream exiting the CAS and a data logger to electronically record every 15 minutes the concentration of the organic compounds in the exhaust stream exiting the CAS.

2. MLC shall install a visual and/or audible alarm on the fixed detector that activates when the organic concentration in the exhaust stream from the CAS as measured by the detector reaches organic breakthrough concentration.

3. MLC shall monitor the operation of the tanks, oil-water separators, and scrubber using mechanical monitoring to measure and manually record the following operating parameters, six times per day and spaced out every 4 hours when any part of the facility is operating:  Pressure drop across the scrubber, pH of the scrubber water, free chlorine concentration, scrubber water flow rate, verification of operation of the scrubber fan and pump, bleach tank level and bleach tank flow rate, presence of overflow, and operating temperature of each tank and oil-water separator vented to the Emission Control System.

4. All fixed detector and mechanical monitoring equipment must be installed such that representative measures of emissions or process parameters from the affected source are obtained. The fixed detector and mechanical monitoring equipment shall be installed, operational, and the data verified prior to the initial performance test. Verification of operational status shall include, but not be limited to, completion of the manufacturer's written specifications or recommendations for installation, operation, and calibration of the system.

5. MLC must ensure the read out (visual display) from all monitoring equipment is readily accessible on site for operational control or inspection by facility operators.

Operation, Maintenance and Calibration for Organic Detector

6. MLC shall follow the manufacturer's guidelines and instructions for installation, location and operation and maintenance of the organic detector and data logger.

7. MLC shall perform daily calibration of the instrument at zero and span 1 as discussed in the Falco User Manual. The calibration gases used shall be zero gas and isobutylene. The isobutylene gas shall be certified by the gas manufacturer to +/- 2%.  If the reading from the calibration check does not meet the calibration criteria (see item 8, below), the monitor shall be adjusted or repaired as needed. Records shall be kept of all calibration checks including what adjustments/repairs had to be made. The calibrations shall be done using the readings from the data recorder.

8. After EPA has approved the engineering analysis identifying the breakthrough concentration at which the alarm will be set and the specified span of the monitor, MLC shall propose to EPA calibration criteria (e.g., within 2.5 % of span).  The calibration

61

criteria for the calibrations to be conducted under item 7 will specify the drift allowance for the monitor readings taken during the daily calibration checks to be acceptable. EPA will need to approve the calibration criteria.

9.  MLC shall designate preventative maintenance procedures for the monitor including the procedure for cleaning the lens before calibrating and having a spare lamp and other parts and/or monitor on hand as these lamps degrade in a period of about 1.5 years.

10. During any and all performance tests, MLC shall record the organic concentration exiting the CAS at the beginning and end of each test run.

Parameter Limit Values for Scrubber

11. During the performance test required by this Decree, MLC shall measure and record the values of the following operating parameters at the beginning and end of each test run: pressure drop across the scrubber, pH of the scrubber water, free chlorine concentration, scrubber water flow rate, verification of operation of scrubber fan and pump, bleach tank level and bleach tank flow rate, presence of overflow, and operating temperature of each tank and oil-water separator vented to the Emission Control System.

12. Using the performance test data, supplemented as necessary with the Emission Control design specifications, manufacturer recommendations, or other applicable information, MLC shall establish the minimum and/or maximum operating parameter values for the following parameters: minimum and maximum pressure drop across the scrubber, minimum pH of the scrubber water, minimum free chlorine concentration, minimum scrubber flow rate, minimum bleach tank level and minimum bleach tank flow rate. The temperature limit for the heated tanks shall be 210 °F.

13. Within 45 days of completing the performance test, MLC must propose and submit to EPA and IDEM for approval, the Emission Control System operating parameter limit values for the parameters listed in item 12, above.

14. A deviation for a given Emission Control System parameter value is determined to have occurred when:

    A.  The scrubber pressure drop is less than or greater than the minimum and maximum scrubber pressure drop operating parameter limit values;

    B.  The scrubber pH is less than the minimum scrubber pH operating parameter limit value;

    C.  The scrubber free chlorine is less than the minimum scrubber free chlorine operating parameter limit value;

    D.  The scrubber water flow rate is less than the scrubber flow rate limit value;

    E.  The fan and pump are not operating when the tanks connected to the Emission Control System are operating;

F.   The bleach tank level is below the minimum bleach tank level limit value;

G.   The bleach tank flow rate is below the minimum bleach tank flow rate limit value;

H.   There is no scrubber overflow; or

I.   The temperature of a tank connected to the Emission Control System is greater than 210 °F.

15. For each deviation of the Emission Control System, except when the deviation occurs during periods of non-operation of the process that is vented to the Emission Control System (resulting in cessation of emissions to which the monitoring applies), MLC is required to undertake immediate response actions to bring any of the parameters listed in paragraph 14 above back into compliance. MLC is required to document any deviations and the response actions taken to address such deviations. Failure to take response actions in response to a deviation is a violation of this Consent Decree.

Monitoring Plan and Recordkeeping

16. For all monitoring equipment (the organic detector and all mechanical monitoring equipment at the scrubber) MLC must develop, implement, and submit to the EPA and IDEM for approval, a site-specific monitoring plan that addresses the installation requirements, operating procedures, calibration procedures, preventative maintenance procedures, corrective actions for monitor malfunctions and deviations, and any other monitoring requirements outlined in this appendix and in this Decree. The plan shall be submitted within 30 days of initial operation of the monitoring equipment and prior to conducting the initial performance test. Upon request of the EPA and/or IDEM, MLC must promptly correct any deficiencies in the site-specific monitoring plan and submit the revised plan.

17. MLC shall maintain the following records (hardcopy or electronic as appropriate) for its monitoring systems for a period of 5 years:

A.   All measurements of the organic concentration electronically recorded by the data logger and subsequently downloaded once per month by MLC;

B.   All measurements of the scrubber operating parameters including:  pressure drop across the scrubber, pH of the scrubber water, free chlorine concentration, scrubber water flow rate, verification of operation of scrubber fan and pump, bleach tank level and bleach tank flow rate, presence of overflow, and operating temperature of each tank and oil-water separator vented to the Emission Control System;

C.   Date and starting and ending times of any periods when any monitoring equipment was inoperative and/or malfunctioning including the reason and corrective actions taken;

D.   All monitoring equipment calibration checks, including but not limited to, records of the determination and adjustment of the calibration drift of the fixed detector;

E.  All adjustments, repairs and maintenance performed on the monitoring equipment, including spare parts inventory;

F.  Date and time of commencement and completion of each deviation and of each period of parameter monitoring exceedance, including those that occur during startups, shutdowns, and malfunctions of the affected source and any corrective actions taken;

G.  Date and time of commencement and completion of each period when the fixed detector used to measure organic compound breakthrough registered a concentration at breakthrough level or above and any corrective actions taken; and

H.  Dates and times that the fixed detector alarm required by Paragraph 18 of the Decree activated, including the organic concentration measured at activation and the corrective actions taken.

64